THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNON TOLBERT, Defendant-Appellant.

First District (6th Division) No. 1—02—3514

Opinion filed October 29, 2004.—Rehearing denied December 15, 2004.

Michael J. Pelletier and Jennifer Y. Wu, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Mary L. Boland, and Leanna Baly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

A jury found defendant, Vernon Tolbert, guilty of first degree murder committed by personally discharging a firearm. The trial court sentenced defendant to a term of 40 years for the murder, with 25 years added pursuant to subsection 5—8—1(a)(1)(d)(iii) of the Unified Code of Corrections (subsection (d)(iii)) (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000)), for a total sentence of 65 years in prison. We find the eyewitness testimony sufficient to support the conviction, and defense counsel provided effective assistance. The trial court correctly applied subsection (d)(iii) here. We also reject defendant's challenges to the constitutionality of subsection (d)(iii). The subsection did not doubly enhance defendant's punishment, it bears a rational relationship to the evils the legislature sought to remedy, and it imposes a penalty proportional to the penalties imposed for similar offenses. Therefore, we affirm the conviction and sentence the trial court imposed.

## BACKGROUND

On August 27, 2000, around 1 a.m., Jesse Montgomery went to

Brother's Palace, a club, with his family and some friends. Defendant went to his sister's birthday party at the same club. Close to 3 a.m. a man spoke to Jesse briefly while he stood near the dance floor. The man then shot Jesse dead. Defendant and many others ran from the club after the shot.

Police spoke with the persons who remained at the scene, mostly Jesse's family and friends. Later that day police showed an array of photographs to several of those persons. Two positively identified defendant's picture as a photograph of the man who shot Jesse, and another made a tentative identification from the photograph. Police obtained a warrant for defendant's arrest.

On June 23, 2001, defendant walked into a police station and told the officer he heard a warrant had issued for his arrest. The officer arrested him. Several eyewitnesses identified defendant in a lineup as the man who shot Jesse. A grand jury indicted defendant on a charge of first degree murder committed by personally discharging a firearm.

At trial the bouncer testified that he frisked all the men who entered the club on the night of the murder. He saw defendant enter the club three different times that night, and the third time he arrived he had changed clothes. According to the bouncer, defendant wore bulky jogging outfits each time, but of different colors. The bouncer, who weighed 235 pounds, described defendant as having a build similar to his own. After he heard the gunshot, the bouncer saw defendant run out of the club carrying a gun.

Kimberly Montgomery, Jesse's niece, testified that she went to the club with Jesse on August 27, 2000. After 2:30 a.m., when Jesse was talking with his friend Tracey Foreman, Kimberly saw defendant go over and talk to Jesse. Kimberly testified that defendant wore black pants and a black sweater vest with a white design over a white shirt, and a baseball cap. She guessed that defendant was 6 feet 2 inches tall and he weighed 150 pounds. She thought that she had seen him once or twice before in the neighborhood.

Kimberly testified that LaDonna Lumpkin, the mother of Jesse's children, went up to talk to Jesse, and she had words with Foreman. Kimberly took Foreman away from Lumpkin, Jesse and defendant briefly, but Foreman went right back to Jesse and put herself directly between defendant and Jesse. Kimberly followed Foreman. Kimberly was standing right behind defendant when he pulled out a gun and shot Jesse. Later that day she positively identified defendant in a photo lineup police showed her. She positively identified him as the shooter again in the lineup conducted at the police station in June 2001.

On cross-examination defense counsel prepared the groundwork for impeaching Kimberly with statements she made to police:

"[Y]ou told the detectives that the guy you saw who shot your uncle you only knew him by the name of Otis. Isn't that what you told them?

A. No.

Q. Well, you did tell them that he hangs at Harding and Chicago Avenue, right?

A. No.

Q. Well, did you say that you had seen *** the guy that shot your uncle in the street area of Chicago and Central Park?

A. I seen him walking between—I said between Central Park through Hardy 'cause those the only stores I go to. I have seen his face before, but I never knew him.

* * *

Q. Now, you also told Detective Wolverton, didn't you, that after the shooting you believed that the man who shot your uncle had dropped the gun?

A. No, I did not."

Counsel began to perfect the impeachment on cross-examination of Sergeant Donald Wolverton:

"Q. Now, when you interviewed Kimberly Montgomery, Miss Montgomery told you that she saw the shooting; is that correct?

A. Yes, sir.

Q. She told you, as well, that after the shooting that she thought that the gun that the shooter used fell to the floor; isn't that correct?

A. No, sir, that's not."

Counsel showed Wolverton the police report of interviews with witnesses. He admitted that he signed the report, but he said his partner prepared it. The report said Kimberly saw the shooter drop the gun, but Wolverton said that his partner erred. Wolverton interviewed Kimberly, and she said she saw Jesse fall to the floor. She did not say the gun fell to the floor. Defense counsel did not ask Wolverton about further statements in the police reports that Kimberly said she knew the shooter only as "OTIS," and he "Hangs at Harding & Chgo."

Foreman described the same confrontations Kimberly described. She corroborated Kimberly's description of the man who shot Jesse and the clothes he wore, except Foreman did not remember a baseball cap and she guessed that he weighed 170 pounds. When Foreman came between defendant and Jesse, she grabbed Jesse's arm to take him where she could talk to him. Defendant's hand hit Foreman as he shot Jesse. She ran out of the club to a nearby police car. She did not positively identify any picture in the photo lineup as the picture of the

shooter, but she explained at trial that she told the officers that the picture of defendant looked like the shooter, but the person in the photograph looked younger than the shooter. She readily picked defendant as the shooter from the lineup held at the police station in June 2001.

Lumpkin further corroborated Kimberly's testimony. Lumpkin, who had never seen the shooter before that night, remembered that he wore black pants and a black-and-white sweater vest, and he stood about 6 feet 3 inches tall, weighing perhaps 175 pounds. She added:

"[A]ccording to the lighting he was kind of shaded out, like dark. The lighting wasn't that good in there, so I couldn't tell the complexion."

Lumpkin saw defendant carry the gun out of the club. She did not identify defendant from the photo lineup, but she identified him in the lineup at the police station in June 2001.

Marvin Johnson testified that he knew defendant from gambling in the neighborhood. Johnson also went to Brother's Palace on August 27, 2000, and he saw defendant talk to Jesse. A few minutes later, Johnson saw defendant knock Foreman down as he shot Jesse. Johnson identified defendant from the photo lineup on August 27 and again in the police station lineup in June 2001. Johnson did not remember what defendant wore at the time of the shooting.

Four defense witnesses testified that they sat with defendant in the club on the night of the shooting. They swore that defendant wore a very distinctive burgundy suit. He did not shoot Jesse. According to defense witnesses, more than 100 people packed the club at the time of the shooting. Prosecution witnesses estimated a crowd of 25 to 35 persons at that time.

The jury found defendant guilty of murdering Jesse by personally discharging a firearm. The presentence investigation report described defendant as 6 feet 3 inches tall and 135 pounds. The report listed four prior convictions for armed robbery, all from 1994, when defendant was 19 years old. The trial court imposed a sentence of 65 years in prison, consisting of 40 years for the murder, plus 25 years added pursuant to subsection (d)(iii) because the jury found that defendant personally fired a gun to kill Jesse.

## ANALYSIS

### I

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R.23).

### II

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

## III

The trial court extended defendant's sentence from 40 years in prison to 65 years in prison based on subsection (d)(iii). 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000). Defendant argues that the court misconstrued the subsection. We review *de novo* the question of statutory construction. *In re Application for Tax Deed*, 285 Ill. App. 3d 930, 932 (1997).

■ The statute provides:

"[A] sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

(a) a term shall be not less than 20 years and not more than 60 years, or

* * *

(d) (i) if the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court;

(ii) if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court;

(iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5—8—1(a)(1) (West 2000).

Defendant contends that "another person" in subsection (d)(iii) is ambiguous in that the court could read it to require injury to a person other than the murder victim. If the statute is ambiguous, we must interpret it restrictively, in favor of defendant. *People v. Whitney*, 188 Ill. 2d 91, 98 (1999).

We find no ambiguity. The subsection makes no prior reference to the murder victim. "[A]nother person" contrasts with its last and only antecedent, "the person [who] personally discharged a firearm." 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000); see *People v. Davis*, 199 Ill. 2d 130, 138 (2002).

Moreover, when the General Assembly added subsection (d)(iii) to section 5—8—1, it also added very similar language to several sections of the Criminal Code of 1961 (720 ILCS 5/1—1 *et seq.* (West 2000)). The legislature added 20 years to sentences for aggravated kidnaping (720 ILCS 5/10—2(a)(7), (b) (West 2000)), armed robbery (720 ILCS 5/18—2(a)(3), (b) (West 2000)), and vehicular hijacking (720 ILCS 5/18—4(a)(5), (b) (West 2000)), if the defendant personally discharged

a firearm during the commission of those offenses, and it added 25 years to the sentences for those offenses if the defendant "personally discharge[d] a firearm that proximately cause[d] great bodily harm, permanent disability, permanent disfigurement, or death to another person" (720 ILCS 5/18—2(a)(4), (b) (West 2000); see also 720 ILCS 5/10—2(a)(8), (b) (West 2000); 720 ILCS 5/18—4(a)(6), (b) (West 2000)). Because the legislature used very similar language for those provisions in the same enactment, we presume that the legislature intended the provisions to have the same meanings. *People ex rel. Scott v. Schwulst Building Center, Inc.*, 89 Ill. 2d 365, 372 (1982). Our supreme court applied the section permitting a 25-year addition to the sentence for armed robbery to a case involving an armed robbery of the person shot. *People v. Moss*, 206 Ill. 2d 503, 509, 532 (2003). That is, the victim of a robbery or kidnaping may qualify as "another person" for purposes of the 25-year extension of the sentence if the defendant personally discharged a firearm in the course of the robbery or kidnaping, and the bullet discharged caused great bodily harm. Similarly, the victim of a murder qualifies as "another person" for purposes of subsection (d)(iii) if the defendant personally discharged a firearm in the course of the murder and the bullet discharged caused great bodily harm. We find that the trial court construed the statute correctly and correctly applied it to defendant.

## IV

■ Defendant challenges the constitutionality of subsection (d)(iii) on three bases. He claims it violates the prohibition against double enhancement, it bears no reasonable relationship to the interests the legislature sought to protect, and it imposes a disproportionate penalty. We address the arguments in turn, applying *de novo* review. See *People v. Malchow*, 193 Ill. 2d 413, 418 (2000).

## A

In several prior cases this court has rejected arguments that subsection (d)(iii) doubly enhances sentences. *E.g., People v. Moore*, 343 Ill. App. 3d 331, 347-48 (2003). Defendant raises a new argument, comparing the sentence imposed under subsection (d)(iii) with the sentence under subsection (d)(ii). Under subsection (d)(ii), the court must add 20 years to the sentence of a defendant found guilty of murder if the defendant personally discharged a firearm during commission of the offense, while the court must add 25 years under subsection (d)(iii) if the defendant personally discharged a firearm and that discharge proximately caused great bodily harm or death. Because the prosecution must prove that defendant caused the death to obtain a murder conviction, defendant contends that causing the death cannot

provide grounds for extending his sentence beyond that permitted by subsection (d)(ii). See *Moss*, 206 Ill. 2d at 533.

For a conviction under subsection (d)(ii) in a case like this one, the prosecution must prove that the defendant, or one for whom the defendant was accountable, performed acts that caused the victim's death, without lawful justification, and he knew his acts created a strong possibility of death or great bodily harm (720 ILCS 5/9—1(a)(2), 5—1 (West 2000)); and that during the commission of the offense, the defendant personally discharged a firearm (730 ILCS 5/5—8—1(a)(1)(d)(ii) (West 2000)). If the defendant had an accomplice, the prosecution could have proved all these propositions without proving that the defendant's personal discharge of a firearm proximately caused the death. For example, the defendant could have entered a club and personally discharged a firearm at a light before his accomplice personally discharged a second firearm to kill the victim. If the defendant's shot at the light did not hit any person, the court should sentence the defendant under subsection (d)(ii), while applying subsection (d)(iii) to the sentence of the accomplice who personally shot the murder victim. Thus, proof under subsection (d)(iii) includes an element not entailed by the proof of murder and the personal discharge of a firearm: it requires proof that the defendant's personal discharge of a firearm proximately caused great bodily harm or death. Because the proof required under subsection (d)(iii) includes an element not inherent in the proof that makes a defendant liable under subsection (d)(ii), subsection (d)(iii) does not use any single element twice for determination of the sentence. Thus, the statute does not involve an impermissible double enhancement. See *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522, 538 (2003).

B

Defendant next argues that the legislature abused its police power by enacting subsection (d)(iii). "[T]he standard of a proper exercise of the police power is whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare." *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 159 (1955).

The legislature enacted subsection (d)(iii) as part of a public act designed to deter the use of firearms in the commission of felonies. *Sawczenko-Dub*, 345 Ill. App. 3d at 531. The offender's possession and use of a firearm creates a "unique, pervasive and enhanced danger" (*People v. Zapata*, 347 Ill. App. 3d 956, 971 (2004)), especially because of the quickness and ease with which one can acquire and use a firearm that "allows the perpetrator to effortlessly and instantaneously

execute an intent to kill once it is formed; and allows an offender to harm a greater number of victims more rapidly than other weapons and inflict deadly wounds on a number of people within a wide area and within a short amount of time." *Zapata*, 347 Ill. App. 3d at 971; see also *Sawczenko-Dub*, 345 Ill. App. 3d at 531. The legislature enacted the subsection as part of its response to a perceived need to halt the increase in the commission of crimes with handguns. *Sawczenko-Dub*, 345 Ill. App. 3d at 531. The legislature reasonably designed the legislation to address the particular evil it sought to remedy. We find that the legislature properly exercised its constitutional police powers when it enacted subsection (d)(iii).

C

Defendant argues that the penalty imposed under subsection (d)(iii) is unconstitutionally disproportionate when compared with the penalty imposed for murder, when compared with the penalty imposed for more dangerous murders by arson and explosives, and when compared with the penalty imposed for exceptionally brutal and heinous murders. This court addressed and rejected the comparison with exceptionally brutal and heinous murders in *Sawczenko-Dub*, 345 Ill. App. 3d at 531-32. We see no need to revisit that conclusion here. For the reasons given in *Sawczenko-Dub*, we still find no unconstitutional disproportionality between the sentencing for exceptionally brutal and heinous murders and murders committed by using firearms.

A defendant found guilty of first degree murder faces a penalty of at least 20 years in prison (730 ILCS 5/5—8—1(a)(1)(a) (West 2000)); one found guilty of a first degree murder committed by personally discharging a firearm faces a minimum of 45 years, 25 years more than the minimum penalty for first degree murder. Thus, the minimum additional penalty for use of a firearm exceeds the minimum initial penalty for first degree murder. Defendant contends that the statute unconstitutionally punishes the increased risk from use of a firearm more harshly than it punishes the realized harm of first degree murder.

Some murders may create no risk for any person other than the murder victim. When a murderer uses a firearm, the legislature has found, the crime creates an increased risk for the entire society. The additional offense of increasing the risk to society warrants the increased punishment of 25 years in prison. When a person commits murder by any means, the legislature permits increased punishments for all of his other crimes, as the court must consider his prior criminal record in sentencing. 730 ILCS 5/5—5—3.2(a)(3) (West 2000). In

particular, if a murderer commits a second murder, the minimum penalty for the second murder is natural life in prison. 730 ILCS 5/5—8—1(a)(1)(c)(i) (West 2000). This penalty is more severe than the penalty imposed if one commits a murder and also exposes others to added risk by using a firearm. Thus, subsection (d)(iii) does not penalize the increased risk more harshly than it penalizes the realized risk.

Finally, defendant asks us to compare the penalty for murders committed with firearms to the penalty for murders committed by arson or explosives. Arson and explosions create great risk for persons other than the immediate victims. The statute permits a minimum sentence of 20 years in prison for murder committed by arson or explosives, while requiring a minimum sentence of 45 years for the murderer who personally discharges a firearm to kill the victim. "[A] penalty violates the proportionate penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely." *Moss*, 206 Ill. 2d at 522.

We agree with defendant that an arson in which only one person dies, or an explosion that kills only one person, harms others by creating unrealized risks for others that are similar to the risk he created by killing one person with a gunshot. However, the legislature may consider factors other than the degree of harm as a basis for the imposition of penalties. *People v. Lee*, 167 Ill. 2d 140, 146 (1995). The legislature may punish more harshly the more frequent kind of crime, in response to the need to halt an increase in the commission of that crime. *Lee*, 167 Ill. 2d at 146. By enacting subsection (d)(iii), the legislature has treated murders committed with firearms as a more pervasive threat to the peace than murders committed by arson or explosives. The relative frequency of the use of firearms in felonies, including murder, warrants the legislative judgment that the use of firearms presents a special hazard needing greater deterrence in the form of increased sentences. Defendant has not shown that subsection (d)(iii) disproportionately imposes a greater punishment on a crime that creates a lesser threat than another comparable crime. We reject all of defendant's arguments for finding the statute unconstitutional.

## CONCLUSION

■ The eyewitnesses to the shooting provided adequate support for the jury's verdict finding defendant guilty of murdering Jesse by personally discharging a firearm. Defendant's attorney apparently made a tactical choice to abandon impeachment of a prosecution witness after part of the attempt to impeach that witness led to bolstering the witness's testimony. Thus, defendant did not meet his burden of showing that his attorney assisted him ineffectively.

We interpret subsection (d)(iii) to require an addition of 25 years to the murder sentence of a defendant who personally discharged a firearm, if the bullet he discharged caused great bodily harm to anyone, including the murder victim. The subsection, so interpreted, does not doubly enhance the defendant's sentence, because the defendant's personal discharge of the fatal firearm is an additional element, not implicit in the included offense of a murder in which the defendant personally discharged a firearm. Subsection (d)(iii) bears a rational relationship to the perceived evil the legislature sought to remedy. The subsection does not impose a disproportionate penalty when one compares that penalty with the penalties imposed for first degree murder, for murder by arson or explosion, and for brutal and heinous murder. We reject all of defendant's attacks on the constitutionality of the sentencing provision. Therefore we affirm the judgment of the trial court.

Affirmed.

FITZGERALD SMITH, P.J., and TULLY, J., concur.