FOURTH DIVISION
MAY 24, 2007

No. 1-05-2636

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| JERMAINE EVANS, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Jermaine Evans, was found guilty of first degree murder and sentenced to a total of 100 years' imprisonment, receiving 55 years' imprisonment for the murder, enhanced by a consecutive sentence of 45 years for personally discharging a firearm proximately causing the death of Larry Simmons. On appeal, defendant contends that: (1) the prosecutor improperly cross-examined defense witness Calvin Williams; (2) the trial court improperly allowed admission of other crimes evidence and evidence of the details surrounding recovery of the murder weapon; (3) the prosecutor improperly elicited testimony from defendant regarding the testimony of other witnesses who testified against him; (4) the trial court improperly precluded defense witness testimony; and (5) his sentence is excessive. For the following reasons, we affirm defendant's conviction and sentence.

BACKGROUND

On April 11, 2002, Larry Simmons, age 17, was killed at the intersection of 68th Street and Normal Street in Chicago's south side, as the culmination of a series of arguments that occurred between the "68th Street Group" and the "69th Street Group."[1] The relevant members of each group are as follows: The 68th Street Group includes defendant (a/k/a "Baby G"), Anthony Burke (a/k/a "Ant" or "Diesel"), Deanis Turner (a/k/a "Dino"), Keonte Williams (a/k/a "Moo Moo") and Brian Hunter. Members of the 69th Street Group include the victim Larry Simmons (a/k/a "Martell"), Nicholas Gentry (a/k/a "Nick") and Donald Smith (a/k/a "Lil' Don").

At trial, Deanis Turner of the 68th Street Group testified on behalf of the State to the following relevant facts. The first argument between the two groups began when members of the 68th Street Group, namely Turner, Williams and Burke, went in search of marijuana. Their search led them to 70th and Eggleston, which required that they cross 69th Street. The 69th Street Group, namely Simmons, Gentry and Smith, did not "appreciate" the 68th Street Group walking through their "territory" and, according to Turner's testimony, told the young men, "they didn't like [them] walking through they [*sic*] block." The 68th Street Group understood the 69th Street Group's block territory to be 69th and Normal. An argument ensued between Burke of the 68th Street Group and Simmons, the victim, of the 69th Street Group.

At some point, the argument subsided and the three young men, Turner, Williams and Burke, continued on their way to 70th and Eggleston and eventually met up with defendant. Burke quickly relayed the earlier encounter between the two groups to defendant. Sometime

---

[1]Prior to trial, the court granted defendant's motions *in limine* to preclude the State from introducing gang membership evidence or any evidence that defendant was involved in drug sales.

thereafter the young men from the initial argument, along with defendant, returned to 69th and Normal to confront the members of the 69th Street Group who had argued with the men earlier.

According to Turner's testimony, defendant questioned the 69th Street Group as to the reason they were "mad" that Turner, Burke and Williams walked through a block that actually "belongs to no one." This discussion quickly escalated into a heated argument, in which Gentry, of the 69th Street Group, allegedly brandished a revolver and threatened the 68th Street Group, warning them that the 69th Street Group would not be moved from their territory.

Coincidentally, Brian Hunter, a member of the 68th Street Group, happened upon the scene while driving his car. He got out of his car and retrieved a baseball bat from his trunk. Gentry quickly turned his attention toward Hunter, never raising his gun at him, but yelling at him to drop the bat. Hunter complied, dropping the bat and fleeing the scene.

This argument eventually subsided and the young men of the 68th Street Group, defendant, Turner, Burke and Williams, returned to 70th and Eggleston. According to Turner's testimony, the young men were angry that the other group had "upped" a gun at their group. Turner testified that defendant said that if the 69th Street Group wanted to play with guns, he would show them how to use one. Turner qualified this statement by adding that the defendant was speaking out of anger and no one understood his words to be a foreshadowing of what was to come. Soon thereafter defendant left Turner, Burke and Williams. Turner testified that he did not know where defendant went at that time.

Turner, Burke and Williams proceeded to return to their territory of 68th and Normal, by way of 69th and Eggleston. During this time, Simmons, Gentry and Smith (the 69th Street Group) approached them and again confronted them. An argument over territory once again

ensued and a fistfight between Burke of the 68th Street Group and Gentry of the 69th Street Group eventually began. Defendant was not present for the beginning of this fight.

Turner further testified that as the fight between Burke and Gentry continued, Simmons, the victim, backed up against a fence with his hand in his pocket. Williams, Turner, Smith and others were watching the fight and Smith allegedly began fighting with Burke as well, in an attempt to help out his friend, Gentry. At some point, defendant pulled up in a blue car, exited the car brandishing a gun and began shooting at Simmons, who was still some 10 feet away from the fight between Burke, Smith and Gentry, leaning against the fence. Defendant shot between five and six rounds. Turner testified that after the shots were fired he ran home. He also testified that he never saw Simmons, the victim, holding a gun, nor did he see any guns other than the gun used by defendant.

Next, Glenda Minor, Simmons' family friend, testified on behalf of the State. According to Minor's testimony, she was driving north on Normal toward 68th Street and stopped at a red light at the intersection of 68th and Normal. While stopped, Minor saw the beginnings of the fistfight between Burke and Gentry and she also saw Simmons leaning up against the fence. When the light turned green, Minor began to drive through the intersection and noticed a group of people, including defendant, crossing Normal. Minor testified that she saw defendant's arm extended out and that she next heard gunshots and saw sparks flying from defendant's hand. Soon thereafter Minor stopped her car in front of where Gentry and Burke had been fighting and where Simmons was now slumped on the fence. Gentry, Smith and Tyrone, a passenger in Minor's car, quickly put Simmons in Minor's car and Minor drove to St. Bernard's Hospital. While at the hospital, Minor spoke with Chicago police officers and identified defendant as the

shooter. The police officers subsequently transported Minor to the 51st Street police station where she identified photographs of defendant, the victim and Gentry.

Minor testified that she never saw the victim, Simmons, with a gun or weapon in his hand. Minor never saw a gun on Simmons when he was placed in her car. Minor never saw Smith or Gentry in possession of gun, nor did she see a gun removed from Simmons' body.

Next, Nicholas Gentry of the 69th Street Group testified to the same essential facts as Turner regarding the confrontations leading up to the shooting, but denied ever having brandished a gun earlier in the evening during the second confrontation. According to Gentry, he got into a fistfight with Burke even though it was Simmons who had been arguing with Burke. Gentry stated Simmons is his cousin so he fought on behalf of Simmons. Gentry also testified that he never saw any guns prior to defendant appearing at the scene with one and never saw the victim with a gun, corroborating Minor's testimony.

Next, Keonte Williams of the 68th Street Group testified to the same essential facts as Turner and Gentry, but contradicted Gentry's denial of the flashing of a gun during the second argument. Keonte Williams testified that Gentry, Simmons and Smith approached the 68th Street Group about 15 minutes after the second confrontation and asked for a "truce." Instead of a truce, however, a fistfight erupted between Gentry and Burke. According to Keonte Williams, just prior to the fistfight between Gentry and Burke, Gentry gave Simmons his watch and a gun for safekeeping. Keonte Williams testified that Simmons put the gun in the right side of his waistband and that it was visible at all times prior to the shooting. Keonte Williams also testified that while he heard a series of gunshots, he did not see defendant until after he (Williams) had run from the scene with his younger sister. When Keonte Williams turned and looked back, he saw defendant standing in the grass holding a pistol. Keonte Williams also

testified, over the prosecutor's objection, that during the fight between Gentry and Burke he heard Smith of the 69th Street Group yell, "Give me the pistol." According to Keonte Williams, Smith's demand for the gun was made before defendant arrived at the scene. Keonte Williams further stated that Simmons, who had the gun visibly tucked in his waistband, did not pull the gun out or hand it over to Smith.

Next, forensic investigator James Shader of the Chicago police department testified that he and his partner recovered four 9-millimeter Lugar cartridge cases from the scene of the shooting.

Chicago police officer Robert Garza testified that he and his partner, Officer Amato, arrested defendant at his home in the early morning hours of April 12, 2002. Defendant readily admitted to the police officers that he knew they were there because there had been a "woo-woo" in which he had shot Simmons. Officer Garza testified, over defense counsel's objections that Officer Garza was not qualified as an expert, that "woo-woo" is a street term for fight or altercation.

Next, Chicago police officer Vernon Mitchell testified on behalf of the State. After Officer Mitchell testified to his background, the defense team called for a sidebar, which was held in chambers out of the presence and hearing of the jury. During the sidebar, the defense sought exclusion of evidence that Officer Mitchell recovered three weapons, only one of which was connected to defendant and the shooting of Simmons, after being notified by a civilian. The prosecutor argued that he was only going to describe the circumstances surrounding the discovery of the weapon and the fact that it was found in a bag with two other guns. The defense objected that a prejudicial inference would arise in which the two other guns would be improperly connected to defendant. The trial court denied the motion.

6

Officer Mitchell then testified that on May 18, 2002, William Love waved down Mitchell and his partner, Officer Johnson, as they were traveling north on Racine toward the 7th District police station. Love showed the officers a black bag containing three handguns, including an Interarms Fire Star 9-millimeter semiautomatic pistol. Forensic investigator Angela Horn testified that the 9-millimeter semiautomatic pistol recovered by Officer Mitchell was the gun that was used in the shooting of Larry Simmons.

The trial court denied the defense's motion for a directed verdict at the close of the State's case-in-chief.

Anthony Burke, of the 68th Street Group, testified as the first witness on behalf of the defense. Burke corroborated earlier testimony that Gentry had brandished a gun during the second confrontation and threatened the Group, saying, "I'll kill you too." Burke noted that defendant had been present during that confrontation.

Burke further testified that prior to fighting with Gentry, Gentry pulled a gun out and gave it to Simmons to hold. According to Burke, defendant witnessed this exchange. Over the prosecution's objection, Burke testified that while fighting with Gentry, he heard Smith of the 69th Street Group yelling something to Simmons. At some point defendant arrived on the scene, but according to Burke, when defendant first arrived, he was just standing there without a gun. Soon thereafter Burke heard gunshots and testified that it was defendant who fired. However, Burke also testified that he saw Simmons with a revolver in his hands. After Burke and Gentry stopped fighting, Burke saw Smith running down the street with the revolver he had seen in Simmons' hands.

The defense next called Calvin Williams.[2]  Williams was a passenger in a car when he saw the precursor to the fight between Burke and Gentry.  He got out of the car, approached the young men and asked them what the problem was.  Both Burke and Gentry responded and then agreed to fight.  Prior to the fight, Calvin Williams saw Gentry hand Simmons a gun.  According to Calvin Williams, a group of 15 to 20 people watched the fight.  Calvin Williams did not participate in the fight and prevented others from joining, notably, Smith.  Calvin Williams testified that he saw Smith reaching for Simmons' pocket, attempting to grab the gun.  Simmons allegedly brushed Smith away.  Calvin Williams then heard gunshots but did not see who fired the gun.  He later testified that he saw Simmons holding a gun, but that the gun was to his (Simmons) side.  Upon hearing the gunshots, Calvin Williams ran to his mother's house.  Soon thereafter, Calvin Williams saw defendant near the Williams' residence at which point defendant told Calvin Williams that he (defendant) had shot Simmons.  Defendant remained at the Williams' residence, on the back porch, for about five minutes.  Calvin Williams never contacted the police, but the next day Detective Garza contacted Calvin Williams, who told him what happened.

On cross-examination, over the defense's objections, the State elicited from Calvin Williams that he changed from his jail uniform into a shirt provided for him by the sheriff, that he had a criminal drug conspiracy charge pending, and that he would be returning to the lockup following his testimony.  The State also impeached Calvin Williams by eliciting information

---

[2]Although Calvin Williams testified to his familiarity with several members of defendant's 69th Street Group, the record does not disclose whether Keonte Williams and Calvin Williams are related by blood, good friends, or even acquaintances.

about his two prior convictions for possession of a controlled substance and unlawful use of a weapon.

Defendant exercised his right to testify in his own behalf. Defendant corroborated the testimony regarding the second confrontation between the 68th Street and 69th Street Groups wherein Brian Hunter retrieved a baseball bat from the trunk of his car, causing Gentry to brandish a revolver, point it at Hunter and threaten to kill someone before the year was out. Hunter ultimately fled the scene and the argument broke up. Gentry, Simmons and Smith then walked back toward 69th and Normal, while Burke, Keonte Williams and Turner walked the other way. Defendant then began talking with two young ladies at the scene of the confrontation.

Soon thereafter, Corey Jackson, a friend of defendant's, arrived in a car. Defendant got in the car with Jackson and they drove to 67th and Parnell in a failed attempt to find Calvin Williams. Jackson and defendant then drove to 68th and Normal, where defendant observed Gentry and Burke arguing. Defendant corroborated earlier testimony, stating that he saw Gentry give his watch to Smith and a gun to Simmons, who put the gun in his right pants pocket. Defendant then watched the fight between Gentry and Burke from Jackson's car. He eventually got out of the car in order to break up the fight. Calvin Williams happened upon the scene, pulling up in his car behind Jackson and defendant.

Defendant then saw Keonte Williams pushing Smith back from the fight. Smith then ran up to Simmons, reaching for Simmons' right pants pocket and yelling, "give me the gun," and "bus," a street term for "shoot." Simmons then looked up and down the street and finally pulled the gun out, prompting defendant to pull his gun out and fire. After shooting once, defendant ran

from the scene while firing more shots. Defendant testified that he continued to shoot because Simmons was shooting at him.

Defendant ran to 67th and Parnell, where he met up with Calvin Williams. Defendant asked Calvin Williams if Simmons had been hit, and Calvin Williams replied that he did not know. Defendant went upstairs with Calvin Williams for a few minutes, but eventually ran home, tossing the gun in Ryan Harris Park as he ran.

On cross-examination, defendant admitted that he fired the gun that killed Simmons and that it had been his intention to shoot him. The State was allowed, over defense counsel's objection, to elicit information that defendant had been gambling with Brian Hunter earlier in the evening. Additionally, the trial court allowed the prosecutor to ask defendant whether defendant had heard the testimony of previous witnesses which was contrary to his own.

Following closing arguments, the jurors were instructed on first degree murder, self-defense and second degree murder. The jury found defendant guilty of first degree murder. The jury also found that defendant personally discharged the firearm that proximately caused Simmons' death, a factor for sentencing enhancement.

Defendant filed a motion for a new trial on January 24, 2005, and filed a second motion for a new trial on April 19, 2005. Defendant subsequently struck parts of his second posttrial motion. After a hearing on the motion on May 10, 2005, the trial court denied the motion for a new trial.

At defendant's sentencing hearing, the trial judge noted that while multiple aggravating factors applied, no mitigating factors applied at all. The court sentenced defendant to 55 years' imprisonment for the murder conviction. Because the jury made a special finding that defendant personally discharged the firearm proximately causing Simmons' death, the trial judge sentenced

defendant to an additional 45-year sentence enhancement, to be served consecutively, pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002).

On July 11, 2005, the court denied defendant's motion to reconsider the sentence. Defendant filed a timely notice of appeal on August 8, 2005. Jurisdiction for this appeal lies pursuant to Supreme Court Rule 603 as this is a direct appeal from a non-capital criminal conviction.

OPINION

Initially, defendant contends that the trial court committed reversible error by allowing the State to improperly cross-examine defense witness Calvin Williams. The record shows that on cross-examination the State was allowed, over objection by defense counsel, to elicit from Calvin Williams: (1) that he was in custody awaiting trial at the time of his testimony, (2) that he came from lockup to testify, (3) that he had changed from his jail uniform into a regular shirt provided by the sheriff, (4) that he had a pending felony case in the same courthouse, (5) that he was charged in that case with criminal drug conspiracy, and (6) that after he testified he was going back into custody on that pending charge.

It is well settled that the scope of cross-examination is within the trial court's discretion and the court's rulings are not overturned absent an abuse of discretion. People v. Nutall, 312 Ill. App. 3d 620, 627, 728 N.E.2d 597, 605 (2000).

Defendant contends, however, that while a witness may be impeached by attacking his character via proof of conviction, proof of arrests, indictments, charges, or commission of crimes are not admissible. People v. Lucas, 151 Ill. 2d 461, 603 N.E.2d 460 (1992); People v. Mason, 28 Ill. 2d 396, 400, 192 N.E.2d 835, 837 (1963). In support, defendant cites authority of our

courts which have consistently held that a witness may be impeached only by the use of former convictions and cannot be interrogated on arrests or indictments. People v. Pecoraro, 175 Ill. 2d 294, 677 N.E.2d 875 (1997); People v. Hoffman, 399 Ill. 57, 63, 77 N.E.2d 195, 198 (1948).

While proof of arrests, indictments and charges are not admissible when attacking a witness's character, showing bias, interest, or motive to testify is a proper mode of impeachment. People v. Bull, 185 Ill. 2d 179, 705 N.E.2d 824 (1998). Our courts have not quantified the number of pending charges required before a witness may be presumed to harbor an antiprosecution bias. Nevertheless, this court has held that a single pending charge is insufficient to establish an antiprosecution bias. People v. Hughes, 168 Ill. App. 3d 758, 762, 522 N.E.2d 1275, 1278-79 (1988). The Hughes court explained that in order to introduce pending charges, such charges must produce an inference that the witness has something either to gain or lose by his testimony. Hughes, 168 Ill. App. 3d at 761-62.

In the present case, the questions posed to Calvin Williams were proper as part of showing his antiprosecution bias. Calvin Williams testified that he is defendant's friend and that he has two prior convictions as well as another charge pending. The charge pending against Calvin Williams, coupled with his two prior convictions, yields an inference that Calvin Williams had something either to gain or lose by his testimony and consequently establishes an anti-prosecution bias. Accordingly, the impeachment was proper.

We observe, however, that the State failed to show how the fact that Calvin Williams was in custody on pending drug charges tended to show that his testimony might have been influenced by interest, bias or a motive to testify falsely. The State's reliance on People v. O'Toole, 226 Ill. App. 3d 974, 990, 590 N.E.2d 950, 961 (1992), is unavailing. In concluding that our courts allow the State to use evidence of a defense witness' prior arrests and charges in

order to establish an anti-prosecution bias or motive to testify, the O'Toole court cited People v. Triplett, 108 Ill. 2d 463, 475 (1985) which quoted from People v. Mason, 28 Ill. 2d 396, 400 (1963). Both Triplett and Mason involved issues where trial court precluded the *defense* from cross-examining State witnesses as to pending changes to the custody status of witnesses. Our supreme court reversed the defendants' convictions in both Triplett and Mason, finding such restrictions violated a defendant's right to confrontation.

The State's further reliance on Alford v. United States, 282 U.S. 687, 75 L. Ed. 624, 51 S. Ct. 218 (1931), is similarly misplaced. The State cites Alford for the proposition that asking a witness where he lives is not only "an appropriate preliminary to the cross-examination" but also "an essential step in identifying the witness with his environment, to which cross-examination may always be directed." Alford, 282 U.S. at 693, 75 L. Ed. at 628, 51 S. Ct. at 220. There, defense counsel attempted to cross-examine a State witness as to his custody status and pending charges and the trial court sustained the State's objection. The Supreme Court reversed, holding that "[t]he purpose obviously was *** to show by such facts as proper cross-examination might develop, that his testimony was biased because given under promise or expectation of immunity, or under the coercive effect of his detention by officers of the United States which was conducting the present prosecution." Alford, 282 U.S. at 693, 75 L. Ed. at 628, 51 S. Ct. at 220.

Neither Mason, Triplett, nor Alford provides support for the State's argument that the cross-examination of Calvin Williams as to his custody status and pending drug charges was proper. Rather, these cases explain the rationale behind the general rule that defendants may cross-examine witnesses for the State regarding their custody status as well as any pending charges. Notwithstanding our conclusion that the State's cross-examination of Calvin Williams

13

on his custody for pending drug charges was improper, we find the error harmless in light of the evidence of defendant's overwhelming guilt.

Finally, we reject defendant's argument objecting to the cross-examination of Calvin Williams on the subject that he "usually wears" a jail uniform.  Defendant objected to testimony concerning the origin of the shirt Calvin Williams wore in court, but did not object to testimony about Calvin Williams' custodial status, or his having been brought into the courtroom by a sheriff.  Defendant has waived these claims for review for failure to both object at trial and file a written posttrial motion.  People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).

Next, defendant argues that the trial court erred in allowing the State to introduce evidence at trial that:  (1) defendant had been gambling earlier on the night of Larry Simmons' murder, and  (2) the murder weapon was found in a bag containing two other handguns.

Our courts have repeatedly held that evidence of other crimes is admissible where relevant for any purpose other than to show the defendant's bad character or his propensity to commit crime.  People v. Wilson, 214 Ill. 2d 127, 135, 824 N.E.2d 191, 196 (2005); People v. McKibbins, 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824 (1983).  One such purpose includes the offering of other crimes evidence when it "constitutes a continuing narrative of the circumstances attending the entire transaction."  People v. Carter, 362 Ill. App. 3d 1180, 1189, 841 N.E.2d 1052, 1059 (2005).  If evidence of other crimes is intertwined with the charged offense or where the events which occurred earlier in the evening led to the charged offense, such evidence may be admissible.  People v. Lewis, 243 Ill. App. 3d 618, 625-26, 611 N.E.2d 1334, 1339 (1993).  As one court reasoned, "[w]hen facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes."  People v.

Collette, 217 Ill. App. 3d 465, 472, 577 N.E.2d 550, 555 (1991).  Additionally, such evidence may be relevant in placing the defendant in proximity to the time and place of the offense. Lewis, 243 Ill. App. 3d at 626.

So long as the other crimes evidence bears "some threshold similarity" to the crime charged, such evidence is admissible.  Wilson, 214 Ill. 2d at 136.  Ultimately, the admissibility of evidence is within the sound discretion of the trial court, and may not be overturned on appeal absent a clear abuse of discretion.  People v. Ilgen, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991).

Defendant first contends that the trial court erred in permitting the State to elicit from him on cross-examination that he had been gambling with Brian Hunter at 73rd and Vincennes earlier on the night of Simmons' murder.  Defendant argues that the prior crime of gambling had nothing to do with the people or the facts involved in either of the arguments preceding the shooting or the actual shooting of Simmons, and that this testimony of other crimes evidence served no other purpose than to prejudice him.

The State responds that this evidence was properly admitted because it was part of the narrative leading to Simmons' murder and because it related to events that occurred later that night.  We agree.  The evidence of defendant's gambling placed defendant in the general proximity in both time and place to the murder.  Furthermore, there is no need to potentially mislead a jury by placing defendant in a "sterile environment," particularly "when there was a history *** that [was] clearly relevant to a determination of the true facts of what took place on the date in question."  Carter, 362 Ill. App. 3d at 1190.

Additionally, evidence of defendant's gambling demonstrates his friendship with Brian Hunter, a key player in the events that unfolded on April 12, 2002.  When the 68th Street Group

15

confronted the 69th Street Group earlier in the evening of Simmons' murder, Hunter happened upon the scene and grabbed a baseball bat from the trunk of his car when he saw Gentry, of the 69th Street Group, brandishing a gun. Defendant was not present for this altercation, but learned of it later and was angry that the rival group had "upped" a gun at his group. Defendant subsequently threatened that if the 69th Street Group wanted to play with guns, he would show them how to use one. Defendant's friendship with Hunter, and particularly the specific evidence of time spent with Hunter earlier that evening, was therefore part of the narrative leading to the murder of Simmons as it related to the events that occurred later that night.

Even if the trial court erred in admitting this evidence, the improper introduction of other crimes evidence is harmless when a defendant is neither prejudiced nor denied a fair trial based on its admission. People v. Nieves, 193 Ill. 2d 513, 530, 739 N.E.2d 1277, 1285 (2000). Here, defendant has failed to show that he was prejudiced by the evidence or denied a fair trial by its admission.

Next, defendant contends that Officer Mitchell's testimony that he recovered the murder weapon in a bag containing two other revolvers linked to neither defendant nor the death of Simmons was improper. Defendant argues that such testimony gives rise to an unfair inference that all the guns belonged to him.

The long-standing rule in Illinois is that "[a] weapon generally may not be admitted into evidence unless there is proof to connect it to the defendant and the crime or unless the defendant possessed the weapon when arrested for the crime." People v. Maldonado, 240 Ill. App. 3d 470, 478, 608 N.E.2d 499, 505 (1992). This court has held that "[t]he potential for prejudicial inferences to be drawn from such a weapon in evidence far exceeds any legitimate purpose identified by the State *** and must be condemned." People v. Jackson, 154 Ill. App.

16

3d 241, 246, 507 N.E.2d 38, 42 (1987). Courts recognize that the admission of unconnected weapons is improper since they "only serve to arouse the jury and prejudice the defendant's position." People v. Smith, 413 Ill. 218, 223, 108 N.E.2d 596 (1952). Therefore, no case upholds the admission into evidence of weapons that were not proved to be in the possession or under the control of the defendant. Smith, 413 Ill. at 221.

The State concedes that Illinois case law does not support the admission of unconnected weapons. Notwithstanding the general rule prohibiting the admission of unconnected weapons, however, improper admission of such weapons is typically regarded as harmless error. See People v. Padgett, 248 Ill. App. 3d 1018, 1025, 618 N.E.2d 982, 987 (1993) (holding that the error of admitting irrelevant weapons into evidence was not prejudicial as the evidence did not contribute to the defendant's conviction since the defendant's guilt was overwhelming); People v. Jackson, 154 Ill. App. 3d 241, 246, 507 N.E.2d 38, 42 (1987) (denying reversal despite error since it was made clear that the unconnected weapon was not the murder weapon). Accordingly, even if the admission of Officer Mitchell's testimony regarding the two unrelated revolvers recovered along with the murder weapon was error, such error is harmless in light of the overwhelming evidence of defendant's guilt.

In this case, any prejudice resulting from the admission of testimony relating to the unconnected weapons was minimized by the nominal role the weapons played in the trial. Evidence regarding the two firearms found together with the murder weapon was briefly adduced from a police officer as part of his testimony regarding the investigation, and the subject was not brought up again. The State never suggested that the two unrelated weapons belonged to defendant or that they were used in the murder. Moreover, the weapons were not physically in court as far as the record shows. The State did not mention the weapons or the circumstance

of their discovery in its closing argument. Most importantly, forensic investigator Angela Horn testified that the Interarms firearm was the sole murder weapon, further clarifying that the unrelated weapons were not involved.

Next, defendant argues that the trial court erred in allowing the State to ask him on cross-examination whether he heard the testimony of Deanis Turner, Calvin Williams and Keonte Williams. Defendant claims that this series of questions enabled the State to repeat and emphasize previous prosecution testimony and forced defendant to judge the veracity of witnesses. Defendant contends this line of questioning discredited him in the eyes of the jury.

In support, defendant argues that questioning a defendant as to the veracity of a prior witness is improper because such questions invade the province of the jury by infringing upon its function to determine the credibility of witnesses. People v. Martin, 271 Ill. App. 3d 346, 356, 648 N.E.2d 992, 1001 (1995); People v. Hicks, 133 Ill. App. 2d 424, 434, 273 N.E.2d 450, 458 (1971). While such questioning is improper however, reversal is warranted only where the prejudice resulting therefrom is substantial. Martin, 271 Ill. App. 3d at 356.

Here, the State did not commit reversible error when the prosecutor questioned defendant about prior witness testimony. The record shows that the prosecutor never asked defendant to comment on the veracity of those witnesses. The following colloquies, which occurred during the State's cross-examination of defendant, are at issue:

First Colloquy

"[THE STATE]: Q. When you left that second argument, you told Deanis Turner, 'They want to play with guns? I'll show them how to play,' right?

[DEFENDANT]: A. No.

18

Q.     Never said that to Deanis Turner, right?

A.     No.

Q.     Deanis Turner is your friend, right?

A.     Yes.

Q.     You heard him come in and testify?

A.     Yes.

Q.     You heard him come in and testified [*sic*] that he heard you say, 'They want to play with guns; I'll show them how to play,' right?

A.     Yes.

Q.     So you went over there the third time to break up the fight, right?

A.     Yes."

Second Colloquy

"[THE STATE]:  Q.  You heard Deanis Turner testify that he never saw a gun out there; you were here for that, right?

[DEFENDANT]:  A.   I'm not really sure exactly what was said.

Q.     You heard Calvin Williams testify, right?

A.     Yes.

Q.     Calvin's your friend, right?

A.     They all my friends.  Everybody around there my friends.

Q.    You heard Calvin Williams testify that Martel had the gun at his side, right?

A.    I'm not sure.

Q.    Did you hear him testify that Martel was keeping Little Don away from him, away from the gun?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Overruled.

[DEFENDANT]:  I'm not for sure.  It's been a long week."

Third Colloquy

"[THE STATE]: Q.  You heard [Keonte] testify, Moo-Moo [sic], right?

[DEFENDANT]:  Yes.

Q.    Did you ever hear him testify that Martel pointed the gun at you?

[DEFENSE COUNSEL]:  Objection.

[DEFENSE COUNSEL]:  Objection, Judge. What is the relevance of this in hearing somebody's testimony?

THE COURT:  Sustained.

[DEFENDANT]:  I'm not for sure –

THE COURT:  Sustained.  Don't answer."

In any event, defendant's challenge to the first colloquy has been waived for failure to object.  Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).  Nevertheless, it should be noted that had this issue been properly preserved for appeal, the State's cross-examination of

defendant was not improper since he was never asked to assess or otherwise comment on the veracity of the witnesses.

The two remaining colloquies properly preserved for appeal reveal proper cross-examination of a criminal defendant. A defendant who testifies in a criminal case and subsequently contradicts testimony of the State's witnesses subjects himself to questions formulated to point out these contradictions. People v. Adams, 111 Ill. App. 3d 658, 666 (1982).

Defendant's reliance on Ryan v. Monson, 33 Ill. App. 2d 406, 179 N.E.2d 449 (1961), is factually inapposite and of no persuasive value, especially in light of the nature of that case (civil action for personal injury) and its age (decision rendered 46 years ago). In that case the defendant asked the plaintiff "more than once" about another witness's testimony and whether it was true or false. Ryan, 33 Ill. App. 2d at 415-16. The court held the question improper and explained that such questions do "not contain the element of the possibility of mistake on the part of the witness." Ryan, 33 Ill. App. 2d at 416. That case is readily distinguishable from the present case since the State never asked the defendant whether another witness's testimony was true or false.

This case is similar to People v. Tolbert, 323 Ill. App. 3d 793, 753 N.E.2d 1193 (2001). There, the prosecutor asked the defendant whether other witnesses' testimony was accurate. Tolbert, 323 Ill. App. 3d at 808. The court held that such questioning was not improper since asking if a statement was "accurate" or "inaccurate" was not the same as asking the defendant if a witness lied. Tolbert, 323 Ill. App. 3d at 809; see also People v. Morse, 33 Ill. App. 3d 384, 391, 342 N.E.2d 307, 312 (1975) (finding no impropriety in State's cross-examination of defendant which asked him whether statements made by witnesses were "wrong" or "mistaken").

21

Similarly, defendant in this case was only asked if heard the testimony of earlier witnesses; he was not even asked to comment on the accuracy of that testimony. While defendant claims he was placed in the untenable position of not only having to defend himself but also having to explain the observations and recollections of other people, the record shows that the prosecutor never asked defendant whether Deanis Turner, Calvin Williams or Keonte Williams lied during their testimony. Accordingly, the cross-examination of defendant was proper.

Next, defendant argues that the trial court erred in sustaining the State's hearsay objections to questions directed at defense witnesses, Calvin Williams and Anthony Burke. Defendant claims that Burke and Williams both would have testified that Donald Smith yelled at the victim to give him the gun and to shoot. This testimony would have corroborated defendant's testimony and his claims of self-defense and defense of others. Defendant argues that Burke and Williams should have been permitted to testify what they allegedly heard Smith say just prior to Simmons' murder because the statements either do not constitute hearsay or they fall within the hearsay exceptions of *res gestae* and/or excited utterance.

The following colloquies are at issue:

First Colloquy

> "[DEFENSE COUNSEL]: Q. During that five- or six-minute period did you hear anybody in the background say anything?
>
> [BURKE]: A. Yes.
>
> [THE STATE]: Objection. I'll withdraw the objection.
>
> [THE COURT]: Overruled.
>
> A. Yes, I heard Little [Donald Smith] and saying –

Q.      Not what he said but –

[THE COURT]:  Sustained.

Q.      Did you hear anybody saying anything?

A.      I heard Little Don saying something.

[THE STATE]:  Objection.

[THE COURT]:  Overruled.

Q.      Do you know who he's talking to?

A.      Yes.

Q.      Who?

A.      Larry."

Second Colloquy

"[DEFENSE COUNSEL]: Q.  Does anything else happen during the fight that involves people, other than the two people who were fighting?

[WILLIAMS]:  Yes, sir.

Q.      What is that?

A.       Little Don, as I took my arm and brushed him, back, I don't know if it (sic) he approached Martell and told Martell to have...

Q.      Don't say what he said.

[THE STATE]: Objection.

[THE COURT]:  Sustained.

[DEFENSE COUNSEL]: Q.  He approaches Martell?

23

A.      Yes."

Hearsay is defined as "testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter." People v. Rogers, 81 Ill. 2d 571, 577, 411 N.E.2d 223, 226 (1980). Consequently, a statement offered for some reason other than for the truth of the matter asserted therein is generally admissible. People v. Velasco, 216 Ill. App. 3d 578, 583, 575 N.E.2d 954, 957 (1991). For example, if a statement is offered to prove its effect on the listener's state of mind, or to show why the listener acted as he did, it is not hearsay. People v. Perez, 209 Ill. App. 3d 457, 466, 568 N.E.2d 250, 255 (1991).

Defendant argues that the statements Smith yelled in the presence of Burke and Williams, "give me the gun," and "bus," were being offered not for the truth of the matter asserted, but to show the state of mind of the recipient after hearing the statement. We reject this argument. Defendant was permitted to testify about the statements he heard Smith make; therefore, he was permitted to tell the jurors how those alleged comments affected his state of mind. The effect of Smith's statements on the respective states of mind of both Burke and Williams was completely immaterial, and thus their testimony concerning Smith's statements was properly precluded.

Alternatively, defendant argues that Smith's statements fall into the excited utterance hearsay exception. In order for testimony to qualify as an excited utterance, three elements must be present: "(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." People v. Poland, 22 Ill. 2d 175, 181, 174 N.E.2d 804, 807 (1961); People v. Johnson, 271 Ill. App. 3d 962, 964, 650 N.E.2d 1, 2 (1995). The ultimate issue is whether there

24

was lack of sufficient time which would allow for "reflection and invention." Poland, 122 Ill. 2d at 181. The determination of whether a statement qualifies as an excited utterance is within the trial court's discretion. People v. Georgakapoulos, 303 Ill. App. 3d 1001, 1012, 708 N.E.2d 1196, 1206 (1999).

Defendant argues that all three elements are present. As to the first element, defendant notes that a fistfight between people who had previously been threatening to kill each other was happening at the time of Smith's statements. Defendant further claims that people knew that Simmons was armed. As to the second requirement, Smith allegedly demanded the gun and directed Simmons to shoot at the exact time of the shooting, allowing no time for fabrication. As to the final element, defendant notes that the statements were directly related to the circumstances of the shooting.

Defendant's argument that the excited utterance exception applies is waived because defense counsel did not raise this theory at proceedings on defendant's motion for new trial. Our courts have repeatedly held that arguments made for the first time on appeal are waived. People v. Brooks, 187 Ill. 2d 91, 718 N.E.2d 88 (1999); People v. Page, 156 Ill. 2d 258, 620 N.E.2d 339 (1993); Enoch, 122 Ill. 2d at 186. Even had this issue been preserved for appeal, the fight between Burke and Gentry does not qualify as the sort of dramatic, startling event capable of generating an excited utterance. This is especially true considering that this was the third confrontation between the two groups in a single evening. Furthermore, our courts hold that the excited utterance rule applies only to victims, not to witnesses. People v. Sullivan, 366 Ill. App. 3d 770, 780, 853 N.E.2d 754, 765 (2006).

Defendant alternatively argues that the testimony of Burke and Williams should have been admitted under the theory of *res gestae*. *Res gestae* refers to the circumstances, facts and

declarations which grow out of the main fact and serve to illustrate its character, and which are so spontaneous and contemporaneous with the main fact as to exclude the idea of deliberation or fabrications. 23 C.J.S. Criminal Law §867 (1989). "As long as the main transaction continues, deeds emanating from it become part of that transaction." People v. Dennis, 181 Ill. 2d 87, 97, 692 N.E.2d 325, 331 (1998), citing People v. Jarvis, 306 Ill. 611, 615, 138 N.E. 102 (1923). This argument, too, is waived because defendant did not raise it below. Brooks, 187 Ill. 2d at 109.

Even had defendant preserved this issue for appeal, the principle of *res gestae* is no longer recognized as a basis for admitting hearsay evidence. Illinois has abandoned the concept of *res gestae* as amorphous because of its indiscriminate application and because it cannot be subjected to a reasonable analysis. Dennis, 181 Ill. 2d at 97 (1998). See Kellman v. Twin Orchard Country Club, 202 Ill. App. 3d 968, 560 N.E.2d 888 (1990) (stating that Illinois courts no longer recognize the term *res gestae*); People v. Rogers, 264 Ill. App. 3d 740, 753, 636 N.E.2d 565, 573 (1992) (Greiman, P.J., specially concurring) (hoping this concurrence "can be the equivalent of a stake in the heart of *res gestae* and that the coffin lid may be securely fastened"); People v. Giles, 261 Ill. App. 3d 833, 841, 635 N.E.2d 969, 975 (1994) (supporting complete abandonment of the concept); People v. Hill, 278 Ill. App. 3d 871, 663 N.E.2d 503 (1996) (disavowing *res gestae* since it serves only to confuse the determination of the admissibility of out-of-court statements or evidence of other crimes).

Despite defendant's multiple hearsay exception arguments, which, as stated above, are waived, defendant's entire argument ultimately fails because he failed to make an offer of proof concerning what Burke and Williams would have testified had the State's objections been overruled. Failing to make an adequate offer of proof results in a waiver of the issue on appeal. People v. Andrews, 146 Ill. 2d 413, 421, 588 N.E.2d 1126, 1131 (1992). As our supreme court

has explained, there are two primary functions of an offer of proof: (1) to disclose to both the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and (2) to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful. People v. Thompkins, 181 Ill. 2d 1, 10, 690 N.E.2d 984, 989 (1998). Therefore, an offer of proof must be "considerably detailed and specific." People v. Peeples, 155 Ill. 2d 422, 457, 616 N.E.2d 294, 310 (1993).

Defendant's final contention is that his sentence is excessive in light of his young age and his lack of adult criminal convictions. The trial court sentenced defendant to a total of 100 years in the Illinois Department of Corrections; 55 years for first degree murder and a consecutive 45 years for personally discharging a firearm during the commission of the offense. Defendant was 21 years old at the time of sentencing. Defendant's criminal record reveals that he received probation once as a juvenile for criminal trespass to a vehicle; the probation was terminated satisfactorily in 2001.

It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant. People v. Stacey, 193 Ill. 2d 203, 209, 737 N.E.2d 626, 629 (2000). An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence. Stacey, 193 Ill. 2d at 209. Accordingly, a trial court's sentencing decision is not overturned absent an abuse of discretion. People v. Perruquet; 68 Ill. 2d 149, 153, 11 368 N.E.2d 882, 883-84 (1977); People v. Tye, 323 Ill. App. 3d 872, 887 (2001).

The Illinois Constitution mandates the balancing of both retributive and rehabilitative purposes of punishment. Ill. Const. 1970, art. I, §11; People v. Quintana, 332 Ill. App. 3d 96, 109, 772 N.E.2d 833, 846 (2002). The trial court is therefore required to consider both the

seriousness of the offense and the likelihood of restoring the offender to useful citizenship. Quintana, 332 Ill. App. 3d at 109. In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime. Qunitana, 332 Ill. App. 3d at 109.

Here, the trial court weighed each of the statutory factors in aggravation and mitigation and determined that no factors in mitigation applied. The trial court did, however, find several aggravating factors applicable. Among the aggravating factors, the trial court found that defendant's conduct caused serious harm; that he had a history of prior delinquency; that the sentence was necessary to deter others from committing the same crime; that defendant was convicted of a felony committed while on bond for another offense; and that defendant committed an offense related to organized gang activities.

Defendant nevertheless argues that the 55-year sentence coupled with the 45-year sentencing enhancement is tantamount to a life sentence for a young man whose crime could very well have been found to be second degree murder. While defendant may have been relatively young at the time of crime, he admitted that he was raised in a good family, never wanted for anything, and was never subject to any kind of abuse.

Defendant further argues that his rehabilitative potential should have been given greater consideration. The trial judge, however, is not required to detail precisely for the record the process by which he determined a sentence nor is he required to make an express finding that defendant lacked rehabilitative potential. Quintana, 332 Ill. App. 3d at 109. Here, the trial court specifically found a "recurring pattern of criminal behavior on the part of the defendant" and ultimately concluded that he "would be likely to commit another crime." The trial court based its

28

conclusion primarily upon the fact that defendant murdered Simmons while on bond for a different offense.

In any event, a defendant's potential for rehabilitation is but one factor for a sentencing court to consider, and it must be weighed against other countervailing factors, including the seriousness of the crime. People v. Spencer, 229 Ill. App. 3d 1098, 1102, 595 N.E. 219, 221 (1992). To be sure, the most important factor a court considers when deciding a sentence is the seriousness of the offense. Spencer, 229 Ill. App. 3d at 1102. Rehabilitative potential, therefore, is not accorded more weight than any other factor. Spencer, 229 Ill. App. 3d at 1102. In this case, defendant failed to reconcile or rebut the trial judge's comments concerning his prospects for rehabilitation, or otherwise explain why his rehabilitative potential should be given more weight.

Defendant also asserts that his sentence is excessive because he has no adult criminal record. However, the absence of an adult criminal record is not remarkable considering defendant was only 19 years old when he murdered Simmons. Moreover, the record shows that defendant's criminal record includes a narcotics offense, a juvenile adjudication for criminal trespass to a vehicle, and a serious arrest record. As mentioned above, defendant was out on bond for a narcotics offense when he killed Simmons.

A sentence is deemed excessive and represents an abuse of discretion only where "the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." Stacey, 193 Ill. 2d at 210. See 730 ILCS 5/5-8-1(a)(1)(a) (West Supp. 2005) (sentencing range for first degree murder not less than 20 or more than 60 years); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002) (from 25 years up to natural life "shall be added" to sentence where defendant personally discharged firearm causing death). Here,

defendant's sentence is consistent with the spirit and purpose of the law, because it complies with the legislative intent underlying he enactment of section 5-8-1(a)(1)(d)(iii). 730 ILCS 5/5-8-1(a)(1)(a) (West Supp. 2005).

The trial court has the authority under subsection (d)(iii) to impose an additional 25 years to natural life to a defendant's sentence when the defendant is found to have personally discharged the firearm proximately causing death. The legislature specifically enacted subsection (d)(iii) in an effort to deter the use of firearms in the commission of felonies. People v. Tolbert, 354 Ill. App. 3d 94, 101, 820 N.E.2d 6, 12-13 (2004). Relying on both Illinois case law and legislative history, the Tolbert court found that an "offender's possession and use of a firearm creates a 'unique, pervasive and enhanced danger,' " due to the speed and ease "with which one can acquire and use a firearm that 'allows the perpetrator to effortlessly and instantaneously execute an intent to kill once it is formed.' " Tolbert, 354 Ill. App. 3d at 101-02, quoting People v. Zapata, 347 Ill. App. 3d 956, 971 (2004).

We conclude that defendant's sentence is well within statutory requirements and that the trial court properly considered all factors in sentencing defendant.

For the reasons stated above, we affirm defendant's conviction and sentence.

Affirmed.

QUINN, P.J., and MURPHY, J., concur.