# Illinois Official Reports

## Appellate Court

***People v. Trice*, 2017 IL App (1st) 152090**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMMY TRICE, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-2090 |
| Filed | March 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-4172(01); the Hon. Carol M. Howard, Judge, presiding. |
| Judgment | Affirmed; mittimus and fines and fees order corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justice Hall concurred in the judgment and opinion.<br>Justice Lampkin specially concurred, with opinion. |

**OPINION**

¶ 1    After a bench trial, defendant Sammy Trice was convicted of delivery of a controlled substance and sentenced to six years with the Illinois Department of Corrections (IDOC).

¶ 2    On appeal, defendant claims (1) that the State failed to establish a proper chain of custody for the controlled substance, although it was the subject of a stipulation between the parties, and (2) that both the fines and fees order and the mittimus should be corrected.

¶ 3    The State agrees that the fines and fees order must be corrected to reflect a total amount owed of $954 and that the mittimus must be corrected to reflect a single count of delivery of a controlled substance, rather than manufacture and delivery as currently indicated. Thus, these corrections are so ordered.

¶ 4    However, for the following reasons, we do not find persuasive defendant's chain-of-custody arguments, and we affirm his conviction.

¶ 5                                    BACKGROUND

¶ 6    On March 12, 2014, defendant Sammy Trice and codefendant Aleric Veal were indicted for one count of delivery of a controlled substance, namely, more than one gram of "heroin, or analog thereof." 720 ILCS 570/401(c)(1) (West 2014). On May 6, 2014, the assistant State's Attorney (ASA) stated that discovery was complete, and no pretrial motions were filed.

¶ 7    On September 19, 2014, defendant waived a jury trial, and the case proceeded to a bench trial. The State called two witnesses: Officer Sal DiFranco and Officer Michael Clemons.

¶ 8    At trial, Officer Sal DiFranco testified that he had been a Chicago police officer for 12 years and that he was currently assigned to the narcotics division of the bureau of organized crime. On November 11, 2013, he was part of a team that conducted a controlled narcotics purchase, and he was "the surveillance officer" whose role was to travel in a covert vehicle and observe the transaction. To make his observations, he sometimes utilized a pair of binoculars. The "undercover officer" was Officer Clemons, whose role was to purchase heroin.

¶ 9    DiFranco testified that he observed Clemons speaking with a person, whom he later learned was codefendant Aleric Veal, and that he observed Veal enter the front passenger side of Clemons's undercover vehicle at 79th Street and Exchange Street. DiFranco followed Clemons's vehicle to the corner of 118th Street and South Sangamon Street, where Clemons parked, and Veal exited the vehicle. The neighborhood was residential with single-family homes. Veal then met a man standing on the sidewalk, whom DiFranco identified as defendant.

¶ 10    DiFranco testified that, using his binoculars, he observed Veal hand defendant United States currency, but DiFranco could not determine the amount. Defendant then handed Veal "small items" that were "smaller than a quarter." DiFranco did not testify about the number of "small items." After this "hand-to-hand transaction," DiFranco observed Veal walk directly back to the undercover vehicle. Veal approached the driver's side, where he held a short conversation with Clemons, and then Veal reached his hand through the front driver's side window.

¶ 11    DiFranco testified that, as Veal approached the undercover vehicle, defendant was still standing on the street but then defendant began walking southbound.

¶ 12    On cross, DiFranco testified that, after Clemons picked up Veal, they stopped at a house. DiFranco testified that, after Veal exited the undercover vehicle, Clemons stated on his police

radio that Veal had to stop at his mother's house. Then Veal returned to Clemons's vehicle, and they drove toward 117th Street and Sangamon Street.

¶ 13 On cross, DiFranco testified that, during the hand-to-hand transaction, DiFranco was 30 to 40 feet away, and he used binoculars. Although he has access to video cameras and photographic cameras, he did not use them. The transaction took only "seconds." After the transaction, Veal spoke for a few "seconds" with Clemons and then Veal entered the passenger side of Clemons's vehicle. DiFranco did not observe them drive away because, when defendant started walking southbound, DiFranco "wanted to be ahead of the game in the surveillance and [he] gambled and went south on 118th" Street and lost sight of defendant.

¶ 14 On cross, DiFranco testified that, when Veal met initially with defendant, DiFranco provided a description over his radio to the other surveillance officers. On redirect, DiFranco testified that he observed other officers stop defendant, and DiFranco was about half a block away at that time.

¶ 15 The State's next witness was Officer Michael Clemons, who testified that he had been with the Chicago police department for 20 years. On November 11, 2013, at 12:15 p.m., he was working as an undercover officer, and his role was to purchase narcotics with prerecorded funds. Clemons then identified People's Exhibt No. 1 as a photo of Veal, whom Clemons met at 79th Street and Exchange Street. Veal was standing on the sidewalk, and then Veal entered Clemons's undercover vehicle. First they drove to 115th Street, and Veal exited Clemons's vehicle and entered Veal's mother's house. After Veal returned to Clemons's vehicle, they drove to a house on South Sangamon Street. When they arrived, Clemons handed Veal $150 in prerecorded funds, and Veal exited the vehicle and walked over to defendant.

¶ 16 Clemons testified that he observed Veal carrying the money in his hand, as Veal walked toward defendant. Then Clemons observed Veal hand defendant the money and defendant hand Veal "several small plastic bags." At this time, Clemons was about 50 feet away. After this transaction, Veal walked back to Clemons's vehicle and approached the driver's side window. Veal then handed Clemons "two small plastic bags" containing a "[t]an colored substance, suspect heroin," which Clemons placed in his pocket. Clemons testified that he maintained custody of them until returning to the police station.

¶ 17 Officer Clemons testified that, after Veal handed Clemons the bags, Veal reentered Clemons's vehicle. Defendant then walked toward Clemons's vehicle and, when defendant reached the driver's side, he stated that "we were short $10." As a result, Clemons handed Veal ten more dollars in prerecorded funds and Veal handed this money to defendant. Clemons and Veal then drove off and returned to their original location, and Clemons dropped Veal off.

¶ 18 Officer Clemons testified that, after he returned to the police station, he viewed two photo arrays, which were marked as People's Exhibit Nos. 2 and 3. From People's Exhibit No. 2, Clemons identified a photo of defendant and, from People's Exhibit No. 3, a photo of Veal. Clemons also inventoried the two packages he received from Veal as one inventory item, which was inventory No. 13044995. This item remained locked up until it was sent to the Illinois State Police crime lab.

¶ 19 On cross, Officer Clemons testified that, after he picked up Veal at 79th Street and Exchange Street, Veal directed Clemons where to go. Veal stated that "he was down at that time, he didn't have any narcotics," so "he asked [Clemons] to take him to his source." The first place that Veal directed Clemons to go was to a residential house on approximately 115th Street. It took about 15 minutes to drive there from 79th Street and Exchange Street. Veal was

in that house 5 or 10 minutes, and Clemons lost sight of Veal while Veal was inside. After Veal returned to Clemons's vehicle, they drove toward 117th Street and Sangamon Street at Veal's direction. After they parked, Clemons handed Veal the money and exited the vehicle. The reason that Clemons did not exit with Veal is that "he didn't want [Clemons] to go with him." As Clemons sat in the vehicle, Clemons stared at the unfolding transaction. Clemons was 50 to 75 feet away.

¶ 20   On cross, Clemons testified that, after Veal exited the vehicle and approached defendant, the transaction took only seconds. When Clemons and Veal arrived at the location, Veal made a phone call, then took the money and exited the vehicle. Defendant then walked toward Veal, down the street. Clemons testified about what occurred after the transaction:

> "Q. [Assistant Public Defender (APD):] You stated that Veal came back to the car and came to the driver's side window, right?
>
> A. Correct.
>
> Q. Is that when he gave you two plastic baggies?
>
> A. Yes.
>
> Q. And inside those plastic baggies were—they contained a brownish rock-like substance suspect raw heroin, correct?
>
> A. Right."

¶ 21   On cross, Clemons further testified, after Veal entered the passenger side, defendant approached the driver's side, stating that "we shorted him $10." Clemons admitted that, in his report, he did not indicate that defendant approached Clemons's vehicle asking for more money. Ten or fifteen minutes elapsed between the time that Clemons received the narcotics and when Clemons and Veal drove off in Clemons's vehicle. Clemons and Veal drove to Veal's residence on 78th Street, which took another 10 or 15 minutes. Several surveillance officers stayed back, and several followed Clemons's vehicle.

¶ 22   On cross, Clemons testified that he had a prearranged signal to indicate that the transaction was complete and he gave that signal when he was sitting in his vehicle near 117th Street and Sangamon Street. Clemons testified that defendant was not arrested on the day of the transaction, or even that same month, but Clemons did not know the exact date.

¶ 23   The State then offered a stipulation, which was read into the record as follows:

> "ASA: Your Honor, the State doesn't have any more live witnesses. We do have a stipulation, [Y]our Honor, that if Jason George was to testify today he would testify that he is a forensic scientist; that he's employed by the Illinois State Police Crime Lab; that on November 13th, 2013[,] he received Inventory No. 13044995 from—
>
> THE COURT: 13044995?
>
> ASA: Yes, from the Chicago Police Department; that he opened the package; that there were two plastic items inside the package; that he tested the said items and it did test positive for heroin. The total weight of the two tinfoil items in the two packages was 1.1 grams. He would further testify that he is an expert in the area of forensic chemistry and all the equipment used was tested, calibrated and functioning properly when he tested the items. He would further testify that a chain of custody was maintained at all times and that[,] after testing was completed[,] he sealed the items back up again.
>
> So stipulated?

APD: As well as that it was 1.1 grams of powder from two items.

ASA: Positive for heroin.

APD: So stipulated.

THE COURT: That stipulation will be accepted and made part of the record."

¶ 24 In the above stipulation, the ASA described the items both as "two plastic items inside the package" and as "two tinfoil items in the two packages." The APD added the word "powder" to the stipulation, stating "it was 1.1 grams of powder from two items."

¶ 25 The appellate record does not contain a copy of the lab or police reports.

¶ 26 After the trial court accepted the stipulation, the State moved into evidence without objection People's Exhibit Nos. 1, 2, and 3, which were all photos or photo arrays; and the State rested. The defense moved for a directed finding, which was denied, and then the defense rested.

¶ 27 The State then waived its initial closing argument, and the defense argued first. Since defendant claims ineffective assistance of trial counsel, we describe counsel's closing argument. The defense argued that Veal had Clemons stop at two different locations and that, although the State would argue that the drugs came from defendant, both testifying officers were far away from the transaction. Defense counsel noted that the officers who arrested defendant did not testify, and the State did not introduce the premarked funds. DiFranco admitted that he had access to cameras but did not use one. Concerning the chain of custody, defense counsel argued:

"APD: What you have before you is Officer Clemons'[s] testimony that he received two bags with brownish rock-like substance raw heroin. The lab report that you heard stipulated to listed 1.1 grams powder substance from two items. There is a huge difference between raw heroin in its rock brown form and powder heroin. Those are different narcotics. Now, the officers testified to the inventory number when it was received and it appears to match what was tested at the lab. But there is a big difference between rock raw heroin and powder substance, Judge. Two bags of powder heroin would not cost $150. So somewhere something was lost in the middle."

¶ 28 Since defendant makes no claims on appeal concerning the prosecutor's rebuttal closing argument, we do not describe it here, except to provide the State's response to defendant's chain of custody argument.

¶ 29 "ASA: With regards to the stipulation, there was an agreement by and through the parties that there was a chain of custody maintained and that it was under the proper inventory number; that it was tested positive and that it was heroin and that was a stipulation by and between the parties. If we're now questioning that stipulation that that was not the proper package that Officer Clemons submitted to the Illinois State Police we could have called in the forensic scientist. It was my understanding that was not at issue today when speaking with counsel. But it is still our argument that Officer Clemons did say he inventoried the number and that it was sent to Illinois State Police and it was a stipulation that forensic scientist Jason George received the inventory and analyzed it and it was positive for heroin."

¶ 30 After listening to closing arguments, the trial court found: "Despite the inconsistencies in the testimony of Officer DiFranco and Officer Clemons I do think there is enough here for a finding of guilty. That will be the Court's finding. The defendant is found guilty."

¶ 31     On October 21, 2014, defense counsel stated that he was going to file a posttrial motion but that, after receipt of the transcript, he would file a more detailed motion. Thus, on October 22, 2012, defendant filed a posttrial motion for a new trial claiming, generally, a failure to prove him guilty beyond a reasonable doubt and also various due process and equal protection claims. However, the motion contained no specifics relating to defendant's case.

¶ 32     On November 17, 2014, defendant filed a motion to reconsider which contained specifics, including a claim that the State failed to prove defendant guilty where "[e]vidence presented on the alleged controlled substance in the instant case was contradictory where UCO Clemons testified that he recovered brown rock-like raw heroin, and where the Chemist's stipulated testimony was the substance tested was powder." On November 21, 2014, the APD observed in court that a student had drafted the motion to reconsider, and the APD asked the court to reschedule the matter so that the student could argue the motion.

¶ 33     On December 3, 2014, the trial court heard arguments concerning defendant's motion. With respect to chain of custody, the student argued on behalf of defendant:

        "STUDENT: Furthermore, Judge, there are substantial questions in this case as to the substance that was, in fact, recovered. Undercover Officer Clemons testified that he received two bags of rock-like suspect heroin, yet at the lab the scientist testified that—or we stipulated that it was powder-like substance. So Judge, the rock-like substance and the powder-like substance is completely two different things. Perhaps the officers lost the rock-like heroin. In any case, it goes to the credibility of that whole investigation in this case, Judge, and it's also simply not credible."

¶ 34     During his rebuttal argument on the motion, the student argued:

        "STUDENT: And Judge, as to the rock-like and the powder, I believe that's crucial in this case because the officer clearly said on the stand that he received a rock-like heroin, yet the lab recovered and tested powder-like heroin. That's two completely different substances, Judge."

¶ 35     With respect to the chain of custody issue, the trial court observed:

        "THE COURT: Now, that seemed to be a point of disagreement between you and the State because you're saying that the officer testified that he recovered a rock-like substance which was heroin. She's saying that he—the officer testified that it was raw heroin, not a rock but raw."

¶ 36     The APD then looked in the transcript for Clemons's testimony on this point and informed the court that Clemons had testified on page 41 that "it was brown rock-like substance, suspect raw heroin." The trial court remarked: "Of course I don't have a copy of the transcript."

¶ 37     On page 41, the transcript indicates that the following exchange occurred during cross-examination:

        "Q. [APD:] Is that when he gave you two plastic baggies?
        A. [Clemons:] Yes.
        Q. And inside those plastic baggies were—they contained a brownish rock-like substance suspect raw heroin, correct?
        A. Right."

¶ 38     Previously, on direct examination, Clemons had testified that he had received "two small plastic bags" with a "[t]an colored substance, suspect heroin," without mentioning the word "raw."

¶ 39　　Denying defendant's motion, the trial court ruled:

"THE COURT: I took detailed notes on the testimony of Officer Saul Defranco[1] and Officer Michael Clemons, and I found their testimony to be credible.

I'm not persuaded that the difference that you point out between the rock and the powder is persuasive—I'm not persuaded that it should require a reversal of my decision at trial simply because I'm not sure if the—whatever substance he originally recovered from the defendant was such that it could break down during the process of being inventoried or being transported or stored like a lump of sugar can be broken down into powder. So the fact that there is some disagreement as to whether or not it was a rock or it was raw or powder is not necessarily persuasive to this Court.

What I did when I presided over the trial was observed the testimony of the officers, their demeanor, and I found them to be credible; and so based on my assessment of their credibility—that's the only thing we have in this record, the testimony of those two officers—I find that the State did prove the defendant guilty beyond a reasonable doubt, and I'm going to respectfully deny your motion for new trial."

¶ 40　　After listening to factors in aggravation and mitigation, the trial court sentenced defendant to six years, which was the minimum.

¶ 41　　The mittimus entered on December 3, 2014, stated that defendant was convicted of "MFG/DEL 1≤15 GR HEROIN/ANALOG." On December 3, 2014, the trial court also entered an order, stating that defendant was entitled to a 320-day credit for time served while in pretrial custody. On appeal, defendant argues, and the State agrees, that he should have received a $5 per day credit against his relevant fines for each of the 320 days that he spent in pretrial custody, for a credit of $1600 (5 times 320). However, the fines and fees order, dated December 3, 2014, shows that he received a credit of only $60, not $1600.

¶ 42　　On December 3, 2014, defendant filed a timely notice of appeal, and this appeal followed.

¶ 43　　　　　　　　　　　　　　　　　ANALYSIS

¶ 44　　On appeal, defendant claims (1) that the State failed to establish a proper chain of custody for the controlled substance, although it was the subject of a stipulation between the parties, and (2) that both the fines and fees order and the mittimus should be corrected.

¶ 45　　For the following reasons, we correct both the fines and fees order and the mittimus. However, we do not find persuasive defendant's chain-of-custody arguments, and we affirm his conviction.

¶ 46　　　　　　　　　　　　　　　I. Chain of Custody

¶ 47　　Defendant makes several arguments concerning the chain of custody of the drugs in the case at bar.

¶ 48　　First, in his brief to this court, defendant argues that "[r]eal evidence is admissible" under only certain conditions and that, in order to introduce "an object," a party must lay an adequate

---

[1]The spelling of the officer's last name in the transcript of the hearing on the posttrial motion is actually "Defranco." However, during the trial transcript, his last name was spelled "DiFranco." We used the latter spelling for consistency's sake. Also, during trial, when asked his first name, he replied "Sal."

foundation. However, there was no "object" that the State sought to admit at trial. The State did not seek to introduce into evidence the actual drugs, or the plastic bags received by the undercover officer, or the package containing the drugs which the chemist received, examined, and resealed. None of this was even marked as an exhibit. On appeal, defendant does not claim that the evidence against him was insufficient due to any failure by the State to introduce these objects.

¶ 49    The only exhibits which the State marked, and which were admitted into evidence, were the three photo arrays, marked People's Exhibit Nos. 1, 2 and 3; and defendant raises no issues on appeal with respect to them. Thus, there is no issue on this appeal regarding the allegedly erroneous admission of any "object" or exhibit.

¶ 50    Second, defendant argues that "the court should not have admitted evidence that there was a positive test for heroin in this case." The only evidence of a positive test was the stipulation. Defendant seems to be arguing that the trial court should have, *sua sponte*, refused to admit the parties' stipulation into evidence. However, defendant provides no case law concerning a trial court's *sua sponte* refusal to admit an agreed stipulation into evidence. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 824 (2008) (a party waives a point by failing to argue it); see also *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited").

¶ 51    Third, defendant argues, using facts from the stipulation, that the State failed to prove a chain of custody for the drugs.

¶ 52    A claim that the State presented an incomplete chain of custody is not a challenge to the sufficiency of the evidence but to its foundation and thus is subject to forfeiture. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 68 (citing *People v. Woods*, 214 Ill. 2d 455, 471 (2005)). The application of forfeiture to such claims is particularly appropriate because a defendant's failure to object to foundation at trial deprives the State of its opportunity to cure any deficiency in the foundation. *Banks*, 2016 IL App (1st) 131009, ¶ 71 (citing *Woods*, 214 Ill. 2d at 470). A chain of custody challenge may be reviewed for plain error in the rare case of a complete breakdown in the chain, such as when " 'the inventory number or description of the recovered and tested items did not match,' " so that " 'there is no link between the substance tested by the chemist and the substance recovered at the time of the defendant's arrest.' " *Banks*, 2016 IL App (1st) 131009, ¶ 68 (quoting *Woods*, 214 Ill. 2d at 471-72).

¶ 53    Defendant argues that there was a complete breakdown in the chain of custody and, without this chain, the State has no case.

¶ 54    In the case at bar, defendant was charged with knowingly delivering "1 gram or more but less than 15 grams of any substance containing heroin, or an analog thereof." 720 ILCS 570/401(c)(1) (West 2014). Thus, the State had to prove beyond a reasonable doubt both the type and weight of the drug—both that it was (1) a "substance containing heroin or an analog" and (2) "1 gram or more." 720 ILCS 570/401(c)(1) (West 2014).

¶ 55    As we observed, the State did not mark as an exhibit or seek to introduce into evidence the actual drugs or the package containing the drugs which the chemist received, examined, and resealed. As for the undercover officer, he testified only that he received "suspect" heroin. He did not testify that the substance was, in fact, heroin or that he had been told by any of the participants that it was specifically heroin. He did not even testify that he had specifically asked Veal to purchase heroin. He testified only that Veal informed him that Veal "didn't have any narcotics." The only other witness was the surveillance officer who testified only that he

witnessed a hand-to-hand transaction. The surveillance officer could not, and did not, swear that the substance was heroin. Without the package itself or the chemist, the only conclusive evidence of the type and weight of the drugs was the oral description which defendant stipulated to.

¶ 56     In essence, defendant argues that the stipulation failed to establish the type and weight of the drugs, due to the allegedly complete breakdown in the chain of custody between the drugs seized by the undercover officer and the drugs tested by the chemist.

¶ 57     We do not find this argument persuasive for the following reasons.

¶ 58     First, defendant stipulated that the chemist would testify to the fact that "a chain of custody was maintained at all times." On appeal, defendant wants to modify that stipulation to read that a chain of custody was maintained at all times *while in the chemist's care*. However, that is not how the stipulation reads. Defendant stipulated to the fact that the chemist would testify that a chain of custody was maintained at all times, thereby waiving any ability to cross-examine the chemist about how he knew this fact and waiving any objections that defendant might have otherwise had to the chemist's personal knowledge of this fact. See *Woods*, 214 Ill. 2d at 474-75 ("by stipulating to the chemist's report and not raising the chain of custody issue at trial," the defendant "affirmatively waived review").

¶ 59     Second, when defendant argues in his appellate brief that the trial court erred in admitting the "heroin evidence," he is arguing, in essence, that the court erred by accepting the very stipulation that his counsel agreed to. The State is correct in arguing that the invited error doctrine would apply to this type of argument. A person cannot invite the trial court to take an action and then complain about that same action in a reviewing court. *People v. Chatman*, 2016 IL App (1st) 152395, ¶ 39 n.15; *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 99; *Lozman v. Putnam*, 379 Ill. App. 3d 807, 828-29 (2008). The Illinois Supreme Court has held, under " 'the doctrine of invited error,' " that a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Carter*, 208 Ill. 2d 309, 319 (2003)). Thus, in the case at bar, defendant cannot complain now that the trial court took an action requested by both the parties, namely, admission of the stipulation. *Woods*, 214 Ill. 2d at 475 ("[i]t would be patently unfair to allow defendant" to challenge the chain of custody on appeal, when he stipulated to the chemist's report in the trial court).

¶ 60     Third, defendant has failed to carry his burden of showing actual evidence of tampering, alteration, or substitution.

¶ 61     To establish a chain of custody for items with unique characteristics and a composition that is not easily changed, the State may establish that an item is the recovered item simply through testimony that the item is now in substantially the same condition as when it was recovered. *Banks*, 2016 IL App (1st) 131009, ¶ 69. For items that are fungible or susceptible to tampering, contamination, or exchange, the State must establish a chain of custody that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution. *Banks*, 2016 IL App (1st) 131009, ¶ 69 (citing *Woods*, 214 Ill. 2d at 467, and *People v. Alsup*, 241 Ill. 2d 266, 274 (2011)). When the State makes a *prima facie* case, the defendant then bears the burden of showing actual evidence of tampering, alteration, or substitution. *Banks*, 2016 IL App (1st) 131009, ¶ 69 (citing *Alsup*, 241 Ill. 2d at 274-75).

¶ 62     In the case at bar, the State made a *prima facie* case where the undercover officer testified to the chain of custody of the drugs while in his care, and the parties stipulated that the chemist

would testify that a chain of custody was maintained at all times, and the inventory numbers given by both the undercover officer and the chemist were the same. *Woods*, 214 Ill. 2d at 472 (the State established a *prima facie* case where "the testimony of [the police officer] and the contents of the stipulation [regarding the chemist] are consistent in that they both speak of the same inventory number and the same number of items").

¶ 63    In response, defendant argues that that the following facts show actual evidence of tampering, alteration, or substitution: (1) that the undercover officer testified to receiving two plastic bags, while the stipulation made a reference to "tinfoil," and (2) that the undercover officer testified that the heroin was "raw," while the stipulation concerning the chemist said "powder." First, the stipulation referred in one place to "two plastic items inside the package" and in another place to "two tinfoil items in the two packages." The phrase "plastic items" corroborates the officer's testimony, while the word "tinfoil" seems at odds with it. Thus, the stipulation does not establish a clear conflict between the chemist's proposed testimony and the undercover officer's testimony about receiving two plastic bags. As for the "raw" comment, defendant argued to the trial court: "there is a big difference between rock raw heroin and powder substance, Judge. Two bags of powder heroin would not cost $150. So somewhere something was lost in the middle." However, defendant failed to present any testimony to substantiate this argument.

¶ 64    For these reasons, we find that defendant failed to carry his burden to show actual evidence of tampering, alteration, or substitution. *Banks*, 2016 IL App (1st) 131009, ¶ 69 (citing *Alsup*, 241 Ill. 2d at 274-75).

¶ 65    Fourth, defendant argues that his counsel was ineffective for agreeing to the stipulation.

¶ 66    To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that he was prejudiced by it. *Banks*, 2016 IL App (1st) 131009, ¶ 123. In establishing the first prong, a defendant must overcome the presumption that counsel's conduct was the result of trial strategy and thus generally immune from an ineffectiveness claim. *Banks*, 2016 IL App (1st) 131009, ¶ 123. To establish prejudice, a defendant must show a reasonable probability that the result of the proceeding would have been different absent counsel's deficient performance, and specifically that the deficient performance rendered the result unreliable or fundamentally unfair. *Banks*, 2016 IL App (1st) 131009, ¶ 123 (citing *People v. Easley*, 192 Ill. 2d 307, 317-18 (2000)).

¶ 67    It would be hard to argue that trial counsel was ineffective when she was the one who effectively inserted both "raw" into the undercover officer's testimony, and "powder" into the chemist's stipulation. During the undercover officer's testimony, she asked:

> "Q. And inside those plastic baggies were—they contained a brownish rock-like substance suspect raw heroin, correct?
> A. Right."

¶ 68    During the stipulation, she added:

> "APD: As well as that it was 1.1 grams of powder from two items.
> ASA: Positive for heroin.
> APD: So stipulated.
> THE COURT: That stipulation will be accepted and made part of the record."

¶ 69    Counsel then argued this discrepancy, between "rock-like" and "powder" to the trial court in her closing argument. Although the argument did not ultimately succeed, counsel's conduct appears to have been the result of considered trial strategy and thus immune from an ineffectiveness claim. *Banks*, 2016 IL App (1st) 131009, ¶ 123.

¶ 70    Lastly, defendant argues on appeal that the trial court erred by relying on its own knowledge, when it denied defendant's posttrial motion for a new trial, stating:

> "THE COURT: I'm not persuaded that the difference that *you point out* between the rock and the powder is persuasive—I'm not persuaded that it should require a reversal of my decision at trial simply because I'm not sure if the—whatever substance he originally recovered from the defendant was such that it could break down during the process of being inventoried or being transported or stored like a lump of sugar can be broken down into powder. So the fact that there is some disagreement as to whether or not it was a rock or it was raw or powder is not necessarily persuasive to this Court." (Emphasis added.)

Defendant argues that, in the above passage, the trial court relied on its own knowledge. However, it was defendant who made the argument during closing that "rock" and "powder" indicated two completely different substances, without any testimony to support the argument. In response to this argument, the trial court stated "I'm not sure." Thus, the trial court was expressing its reluctance to rely on counsel's knowledge, not the court's.

¶ 71                                            II. Fines and Fees

¶ 72    On appeal, defendant claims, and the State agrees, that he should have received a $5 per day credit for each of the 320 days that he spent in pretrial custody, for a credit of $1600 (5 times 320). However, the fines and fees order, dated December 3, 2014, shows that he received a credit of only $60, not $1600.

¶ 73    The fines and fees order stated that the sum of the fines and fees was $2554. From this amount, the order indicates that only $60 was subtracted, for a total owed of $2494. As noted, the State agrees that the fines and fees order should be corrected to reflect that defendant's credit for pretrial custody should be 320 times $5, or $1600—not $60. When $1600 is subtracted from $2554, the result is $954, which both the State and defendant agree is the total amount owed by defendant for fines and fees. Thus, this court orders the fines and fees order corrected to reflect (1) a $1600 credit, not a $60 credit, for time served in pretrial custody and (2) a total amount owed by defendant of $954.

¶ 74                                            III. Mittimus

¶ 75    Defendant also asks this court to correct the mittimus to reflect that he was convicted of one count of delivery of a controlled substance, and the State agrees. The mittimus entered on December 3, 2014, stated that defendant was convicted of "MFG/DEL 1≤15 GR HEROIN/ANALOG." As we may correct the mittimus without remanding the cause to the trial court (*People v. Smith*, 2016 IL App (1st) 140039, ¶ 19), we direct the clerk of the circuit court to correct the mittimus to reflect the correct offense: delivery of a controlled substance, specifically, "1 gram or more but less than 15 grams of any substance containing heroin, or an analog thereof." 720 ILCS 570/401(c)(1) (West 2014).

¶ 76        CONCLUSION

¶ 77        For the foregoing reasons, we affirm defendant's conviction but we order (1) the fines and fees order corrected to reflect (a) a $1600 credit, not a $60 credit, for time served in pretrial custody and (b) a total amount owed by defendant of $954 and (2) the mittimus corrected to reflect a single count of delivery of a controlled substance, rather than manufacture and delivery as currently indicated.

¶ 78        Affirmed; mittimus and fines and fees order corrected.

¶ 79        JUSTICE LAMPKIN, specially concurring.

¶ 80        I specially concur only in the result reached by the majority. This case, however, does not qualify for disposition by opinion because it does not establish a new rule of law; does not modify, explain, or criticize an existing rule of law; and does not resolve, create, or avoid an apparent conflict of authority within the appellate court. Ill. S. Ct. R. 23(a) (eff. July 1, 2011).