2025 IL App (1st) 230521-U

No. 1-23-0521

Order filed February 4, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 18CR17744 |
| | ) | |
| LESLIE WARD, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's convictions for first degree murder over his contentions that the trial court abused its discretion when it allowed the State to introduce photographs of the victims' bodies and imposed an aggregate sentence of 50 years in prison.

¶ 2    Following a jury trial, defendant Leslie Ward was convicted of two counts of first degree murder and sentenced to a total of 50 years in prison. On appeal, defendant contends that the trial court abused its discretion when it (1) allowed the State to introduce multiple photographs of the

victims' "decomposing remains" when the photographs were irrelevant to any disputed issue and (2) imposed a *de facto* life sentence for offenses that occurred when defendant was 17 years old without adequately considering his traumatic childhood. We affirm.

¶ 3     Defendant and his codefendant Kahlil Colone were charged by indictment with multiple counts of first degree murder arising from the August 17, 2018, shooting deaths of Darnell Flowers and Raysuan Turner. Defendant was 17 years old at the time of the offenses. Defendant and Colone were tried in simultaneous but severed jury trials. We detailed the facts of this case in our disposition of Colone's appeal. See *People v. Colone*, 2024 IL App (1st) 230520. We relate only those facts necessary to the disposition of this appeal.

¶ 4     At trial, Melanie Reneau, Flowers's mother, testified that she last saw him on the morning of August 17, 2018. On August 19, 2018, Reneau was notified Flowers was found in the "woods," and she later identified his body at the medical examiner's office. The parties stipulated to a photograph of Flowers in death.

¶ 5     Rayniecia Morris, Turner's mother, testified that she last saw Turner on the afternoon of August 17, 2018. The following day, Morris filed a missing person's report and went to the area around Golden Gate Park in Chicago to look for him. There, she spoke to Colone. Morris also spoke to defendant, who stated that the prior day he, Turner, Flowers, Colone, and others smoked "weed" in the park. Defendant further stated that he did not see Turner leave. On August 19, 2018, police informed Morris that Turner's body was found. She later gave his cell phone to a detective. The parties stipulated to a photograph of Turner in death.

¶ 6     Victoria Hutchens testified that on August 17, 2018, she and her friend Heaven Johnson were at Golden Gate Park. There, she saw defendant, Colone, and two other boys. Hutchens and

Johnson went into a store and the boys entered the woods. Later, after Hutchens returned to the park, Colone exited the woods, asked her to hold his and defendant's phones, and reentered the woods. Hutchens then heard four gunshots and ran away. Later, when Hutchens and Johnson were in Johnson's backyard, defendant arrived and asked for the phones. The following day, Colone contacted Hutchens to ask that she and Johnson come to defendant's home. There, defendant stated that the girls did not see anything. Hutchens understood that Colone was telling her that she was not outside on the day of the shooting. She understood that defendant was telling her that she did not see Colone, defendant and the two boys going into the woods.

¶ 7 On August 18, 2018, Hutchens told the investigators what she had seen and heard regarding Colone, defendant, and the two boys who went with them into the woods.

¶ 8 Paul Presnell, a forensic investigator for the Chicago Police Department, testified that on the night of August 19, 2018, he photographed two deceased males and the surrounding area. These photographs were admitted and published without objection. Presnell described the photographs as showing the victims in a state of decomposition including the presence of maggots.

¶ 9 Chicago Police Department lieutenant Patrick Kinney testified that, after midnight on August 20, 2018, he was directed to the center of a wooded area where he observed the victims, facedown and "extremely decomposed." After speaking with fellow detectives, Lieutenant Kinney learned the possible identities of the victims as Flowers and Turner, and was informed of a possible witness and the physical description and names or nicknames of the offenders. Following a search of a police database, officers were looking for Colone and defendant. Later that day, Lieutenant Kinney spoke to Hutchens, who stated that she had seen four people enter the woods, but only two exit. Colone and defendant were arrested that day, but later released. While in custody, defendant

stated that he had a Facebook account under the name "BG Choppa," and Colone stated that he had a Facebook account under the name "BG Shoota."

¶ 10    Lieutenant Kinney further testified that he reviewed Flowers's Facebook Messenger activity on August 17, 2018, which included conversations with both defendants. Flowers's Facebook account was under the name "BG Bibby." Turner's Facebook account was under the name "BG Herbo." Lieutenant Kinney served search warrants for these accounts on Facebook and reviewed the information received.

¶ 11    Lieutenant Kinney detailed different Facebook conversations between defendant, Colone, and the victims. He explained that messages on the afternoon of August 17, 2018, showed that Flowers asked each defendant individually where he was going to be and informed them that Flowers and Turner would be coming. The day after the murders, both defendant and Colone sent messages to Flowers's account, stating that people were looking for Flowers and asking for his location. Defendant also messaged Turner, asking for Turner's location. Lieutenant Kinney also detailed messages between defendant and the Facebook account "Migooboy Jordan" on August 17, 2018, which Lieutenant Kinney understood as defendant offering to trade a 9-millimeter firearm and $250 for a .357-caliber firearm, the kind of firearm used in this shooting.

¶ 12    Cook County chief medical examiner Dr. Ponni Arunkumar testified that autopsies were performed on Turner and Flowers on August 20, 2018. Photographs from both autopsies were admitted and published without objection.[1] Each victim suffered two gunshot wounds, the cause of death was multiple gunshot wounds, and the manner of death was homicide.

---

[1] Included among these photographs were the photographs stipulated-to during the victims' mothers' testimony.

¶ 13    After the State rested, defendant moved for a directed finding, which the trial court denied. Following argument, the jury found defendant guilty of the first degree murders of Flowers and Turner. The trial court ordered a presentence investigation (PSI). Defendant moved for a new trial, which the court denied after argument.

¶ 14    The PSI report stated that defendant declined an interview. The report listed three juvenile adjudications for aggravated assault of a teacher or school employee. Defendant was also adjudicated guilty of robbery, armed robbery, burglary, assault, aggravated assault "USE DEADLY WEAPON REPLICA FIREARMS/PELLET GUNS," and the receipt, possession, or "SEE" of a stolen vehicle.[2]

¶ 15    Defendant filed a mitigation report, which stated that he moved to Chicago at the age of two following his parents' divorce. He lived in the Golden Gate Park neighborhood, and was an "outgoing kid" who played sports and video games with friends. Defendant had an " 'off and on' " relationship with his father, who lived in Atlanta, was close to his mother, siblings, and aunt, and had a six-year-old daughter. At the time of his arrest, defendant attended high school. Although defendant was not "formally" diagnosed with a learning disability, his mother believed an evaluation was needed.

¶ 16    The mitigation report further stated that when defendant was 11 years old, his cousin, Davis, was shot and killed. Although defendant did not see the shooting, defendant watched as Davis was treated and taken to a hospital. Defendant's mother believed that this was a "defining moment" in his life. The report further stated that defendant's neighborhood was known as a " 'Toxic Doughnut' " due to the presence of lead paint and industrial waste.

_____

[2] Defendant was also adjudicated delinquent of "Replica Firearm/Pellet Guns."

¶ 17    In a letter in support, defendant's aunt stated that defendant helped with his younger siblings and matured when he became a father. In a second letter, defendant's cousin stated that defendant was happy and generous, and that his daughter needed him in her life. In a third letter, another cousin stated that defendant was good with children and deserved a second chance because he was "so young." Also attached to the mitigation report were articles about the Davis shooting and defendant's neighborhood, and a "White Paper on the Science of Late Adolescence."

¶ 18    At sentencing, the State presented the grand jury transcript of Lakia Fisher, dated November 19, 2018. Fisher testified that in August 2018, she lived on the 400 block of East 133rd Street in Chicago and attended Fenger High School. At that time, Fisher had been dating defendant for three years. Defendant lived across the street from Fisher. She also knew Colone as a friend of defendant. Fisher also knew both Turner and Flowers and considered them to be her friends.

¶ 19    On August 17, 2018, Fisher saw defendant at around 2 p.m. at defendant's house. Colone arrived around 3 p.m. At one point, Colone and defendant were outside on the side of defendant's house to talk alone, but Fisher was able to hear their conversation from inside the house. She heard Colone and defendant discuss their plan to kill Turner and Flowers. She said defendant was panicking, but Colone told him not to worry. Fisher testified that they wanted to kill Turner and Flowers because defendant said there "was money on their heads." After Colone received a message from Flowers, he and defendant left to meet Turner and Flowers at the bus stop in front of the wooded area. Fisher later saw all four boys together in front of defendant's house. The boys walked to the woods, and Fisher heard gunshots approximately 40 minutes later. She saw defendant approximately an hour after she heard the gunshots and then Colone about 20 to 30 minutes later.

¶ 20     The next day, August 18, 2018, Fisher saw Morris, Turner's mother, looking for Turner around noon. Fisher saw defendant around 7 p.m. or 8 p.m. that night. Defendant gave her a bag, and when she looked inside, it contained a gun. She described the gun as having a brown handle and with a cylinder that can spin and pop out and then back in. Defendant told her not to give the gun to anyone or tell anyone that she had the gun. She hid the gun for two days. A few days later, Fisher spoke with defendant, and he told her that Colone killed "those boys," referring to Turner and Flowers. Defendant then took the gun, and Fisher never saw it again.

¶ 21     The State further asserted that no statutory sentencing factor in mitigation applied. As to the *Miller v Alabama*, 567 U.S. 460 (2012), factors applicable to the sentencing of juveniles, the State argued that defendant was "mature enough" to plan the murders. The State also presented victim impact statements from Turner's and Flowers's families.

¶ 22     In allocution, defendant stated that the victims were "[n]ot bad people." He and Colone, who was like his "little brother," would not "do nothing like that to no people that we hang with."

¶ 23     Following argument, the trial court made detailed findings pursuant to section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2020)). The court noted, in pertinent part, that it did not observe any evidence of defendant's immaturity; rather, it was "the opposite." The court further stated that although Colone was more "outspoken" and intelligent, the court did not see evidence that Colone pressured defendant; instead, they acted together. The court noted that "peers in adolescence tend to do things together" that one would not otherwise do alone, which was what happened in this case. Here, two peers worked together for a "certain end," that is, the murder of two young men. The court stated that this was a "horrible murder" for "no good reason."

¶ 24 As to Fisher, the court noted that Fisher testified before the grand jury that she overheard defendant "planning this or talking about this" and then received a firearm from defendant. The court also noted that Hutchens testified that Colone gave her Colone's and defendant's phones, which was evidence of planning rather than "some sort of impulsive act." Moreover, the Facebook messages showed the "formulation" of a plan to murder Turner and Flowers. That is, defendant and Colone planned, and then led Turner and Colone into the woods. The court concluded that, based upon the circumstances of the offenses and defendant's actions afterward, this was "not a situation where somebody driving down the street maybe saw somebody [he] didn't like, words were exchanged, and bullets started flying." Rather, this was a "much more serious planned event."

¶ 25 The court therefore sentenced defendant to 25 years for each first degree murder conviction, to be served consecutively. Defendant moved to reconsider the sentence, which the trial court denied.

¶ 26 On appeal, defendant first contends that the trial court abused its discretion when it allowed the State to introduce multiple "gruesome" photographs of the victims' "maggot-infested decomposing remains." Defendant asserts that the photographs were irrelevant to the question before the jury, *i.e.*, whether he was responsible for the victims' deaths, and served only to prejudice the jury against him.

¶ 27 The State responds that the photographs were properly presented to the jury as the "infestation and decay" of the victims' bodies was an inherent part of the offenses. The State argues that the photographs related to the nature and extent of the victims' injuries, the location and condition of their bodies, and the cause of their deaths. Moreover, the photographs aided the jury in understanding the testimony of the forensic investigator and the medical examiner.

¶ 28 Defendant acknowledges that he failed to object to the photographs or include this claim in his posttrial motion. To preserve an issue for review, a defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so results in forfeiture of that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Defendant asks us to review this alleged error under the plain error doctrine, as well as for trial counsel's ineffectiveness for failing to properly preserve the issue.

¶ 29 Pursuant to Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." The plain error rule

"allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

¶ 30 However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, "Illinois's plain error rule is a narrow exception to forfeiture principles." *People v. Jackson*, 2022 IL 127256, ¶ 18.

¶ 31    A defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). The first step of plain error analysis is to determine "whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 32    Additionally, claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Pursuant to *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced him. *Id*. at 687. To demonstrate deficient performance, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, the court need not ever consider the quality of the attorney's performance. *Id*. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 33    In the case at bar, we need not decide whether trial counsel was ineffective or whether plain error review would apply because defendant's claim regarding the crime scene and autopsy photographs fails on the merits.

¶ 34    Generally,

> "[p]hotographs of a decedent may be admitted to prove the nature and extent of injuries
> and the force needed to inflict them, the position, condition and location of the body, the
> manner and cause of death, to corroborate a defendant's confession, and to aid in

understanding the testimony of a pathologist or other witness." *People v. Richardson*, 401 Ill. App. 3d 45, 52 (2010).

¶ 35    "If photographs are relevant to prove facts at issue, they are admissible and may be shown to the jury unless the prejudicial nature of the photographs outweighs their probative value." *People v. Chapman*, 194 Ill. 2d 186, 219 (2000). "When a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact." *Id.* at 219-20. "Even gruesome or disgusting photographs may be properly admitted into evidence if they are relevant to establish any fact at issue in the case." *People v. Armstrong*, 183 Ill. 2d 130, 147 (1998). "If photographs could aid the jury in understanding testimony, they may be admitted even if cumulative of that testimony." *Chapman*, 194 Ill. 2d at 220. "The decision of whether a jury should be allowed to see photographs of a decedent is a decision that rests within the sound discretion of the trial judge." *Id.* at 219.

¶ 36    Defendant challenges the admission of photographs taken of the victims at the crime scene and during each victim's autopsy. During his testimony, forensic investigator Presnell used the photographs to detail how he discovered the bodies in the wooded area. He first discussed Flowers's body, which was found facedown and photographed in that position. Investigator Presnell then rolled Flowers's body over to take photographs of his face and clothing, and to search his pockets. The photographs showed the state of decomposition, including the presence of maggots. Similarly, Turner was discovered facedown and photographed in that position, as well as when he was turned over to photograph his face and search his pockets.

¶ 37    Initially, we note that two complained-of photographs taken by the medical examiner were presented during the testimony of Reneau and Morris and stipulated by the parties as how Flowers

and Turner looked in death. "A person cannot invite the trial court to take an action and then complain about that same action in a reviewing court." *People v. Trice*, 2017 IL App (1st) 152090, ¶ 59; see also *People v. Kane*, 2013 IL App (2d) 110594, ¶ 19 ("A party who agrees to the admission of evidence through a stipulation is estopped from later complaining about that evidence being stipulated into the record."). Because defendant stipulated to the admission of these two photographs of the victims, he cannot now complain that their admission was in error.

¶ 38    The remainder of the complained-of photographs from the victim's autopsies depicted the injuries to their bodies when they arrived at the morgue. These photographs were relevant to show the condition of the victims' bodies, as well as to understand Dr. Arunkumar's testimony. See *Richardson*, 401 Ill. App. 3d at 52. Moreover, the autopsy photographs were relevant because Dr. Arunkumar did not perform the autopsies but was able to discuss the injuries and condition of the bodies based upon the autopsy reports. For example, when discussing a photograph of Turner's body, Dr. Arunkumar explained that "because of the maggots in the area, it was hard to make out if this was the entrance wound or the exit wound."

¶ 39    We are unpersuaded by defendant's reliance on *People v. Garlick*, 46 Ill. App. 3d 216 (1977), and *People v. Coleman*, 116 Ill. App. 3d 28 (1983).

¶ 40    In *Garlick*, although the defendant admitted to killing the victim and asserted insanity as an affirmative defense, a photograph of the victim's "massive head wound" was admitted at trial. *Garlick*, 46 Ill. App. 3d at 224. On appeal, the defendant argued that the photograph should not have been admitted because it was irrelevant and prejudicial given his admission that he committed the offense. The appellate court agreed, finding that the admission of the photograph "could serve no purpose other than to inflame and prejudice the jury in the grossest manner" when the defendant

had admitted his guilt and raised an insanity defense. *Id*. The court determined that the trial court erred in allowing the photograph to go to the jury when it was "needlessly prejudicial." *Id*.

¶ 41 In *Coleman*, the jury was shown a color slide depicting the victim's "decomposing, maggot-infested, partially autopsied body," which the appellate court found " 'absolutely hideous.' " *Coleman*, 116 Ill. App. 3d at 35. The photograph showed "[s]everal teeth [were] missing, and the brain [was] exposed and lying next to the head." *Id*. Additionally, the medical examiner testified that the slide was "of no use to him in establishing the identity of the decedent." *Id*. at 36. The *Coleman* court concluded that the photograph of "an autopsied, decomposed body" carried "extremely little probative value" in establishing the victim's identity. *Id*.

¶ 42 Unlike in *Garlick*, the question of whether defendant committed the murders was at issue here and the State was entitled "to prove every element of the crime charged and every relevant fact." *Chapman*, 194 Ill. 2d at 219-20. Moreover, "the appellate court's comments [in *Garlick*] about the photograph were mere *dicta*, since the appellate court had already decided that a new trial was warranted on other grounds." *People v. Maldonado*, 402 Ill. App. 3d 411, 420 (2010).

¶ 43 Although the photographs in the present case depicted maggots and the damage caused by them, unlike in *Coleman*, these images were relevant to establish the effects of the maggots on the gunshot wounds and related to the medical examiner's determination of the path of the bullets and injuries sustained by Flowers and Turner. Accordingly, these photographs were probative of the nature and extent of the victims' injuries.

¶ 44 To sustain defendant's first degree murder convictions, the State was required to prove, *inter alia*, that he performed an act that caused the deaths of Flowers and Turner. See 720 ILCS 5/9-1(a) (West 2016). Accordingly, the State was permitted to present evidence relating to whether

defendant's actions caused their death. See *People v. Starks*, 287 Ill. App. 3d 1035, 1042 (1997) ("Regardless of the fact that defendant did not dispute the cause of death or the force used, the People may still prove every element and relevant fact of the offense charged, and if autopsy photos are relevant to establish any such fact, they are admissible despite their gruesome nature.").

¶ 45    Here, the complained-of photographs depicted how the bodies were discovered and their condition as well as the nature of the injuries and damage caused by both the gunshots and the maggots while the bodies were in the woods. Because the photographs were probative to establish both relevant facts and the requisite elements of the murder charges, the trial court did not abuse its discretion in allowing their admission. When there is no error, there is no plain error and counsel cannot be ineffective for failing to raise the issue. See *People v. Johnson*, 218 Ill. 2d 125, 139 (2005). Thus, this claim fails.

¶ 46    Defendant next contends that this court should vacate his *de facto* life sentence or remand for resentencing when the trial court abused its discretion by failing to "adequately" consider his traumatic childhood. He argues that the trial court mischaracterized, dismissed, and "altogether ignored" mitigation evidence.

¶ 47    "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). "An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence." *Id*. Accordingly, a trial court's sentencing decision will not be overturned absent an abuse of discretion. *Id*. "The reviewing court may not reverse the sentencing court just because it could have weighed the factors differently." *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 28 (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991)).

¶ 48    "In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation, which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime." *Evans*, 373 Ill. App. 3d at 967. "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 49    Here, defendant contends that the trial court "dismissed" and downplayed the impact of his cousin's death and the "toxic" conditions in his neighborhood. He further argues that the court considered some mitigation evidence in aggravation.

¶ 50    Because defendant was 17 years old at the time of the offenses, the trial court was required to consider the following additional factors in mitigation when imposing sentence:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;
>
> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;
>
> (5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2020).

¶ 51    In sentencing defendant, the trial court stated that it reviewed defendant's "mitigation packet," the PSI report, and the applicable statutes. The court then detailed the applicable sentencing range of 20 to 60 years in prison, and that because there were two victims the sentences would be consecutive. Next, the court made detailed findings pursuant to section 5-4.5-105(a).

¶ 52    The court recognized the trauma Davis's shooting caused defendant, although defendant was not present when Davis was shot. The court further recognized that trauma affected "many of us." The court considered that "the Gates" was referred to as the "Toxic Donut," and acknowledged the article referencing the toxicity in certain "deprived neighborhoods" and how that "may affect someone." The court stated that, although there was violence in the community, good people lived there. The court considered the letters in support of defendant and the article about the development of early, middle, and late adolescence. As to the PSI report, the court noted that defendant's juvenile adjudications began when he was about 14 years old, and led to a "consistent interaction" with the juvenile justice system.

¶ 53    Turning to the section 5-4.5-105(a) factors, the court stated that, based upon the written materials and observation of defendant, defendant had good relationships with his parents, family, and child, and was involved with friends. He attended school, and the court had no evidence of a learning disability, grades, or school records. Considering that defendant was 17 years old at the time of the offenses, the court was "not sure [it had] any evidence of *** level of maturity at the time of the offense, *** as far as trying to make an assessment as to your level of maturity." The court noted that defendant was "offered opportunities" through the juvenile justice system. However, the court did not see any evidence of defendant's immaturity; rather, "it's just the opposite." Further, the court did not see any evidence that defendant was unable to consider the risks and consequences of his behavior. Nor did it see "a lot" of evidence to support the existence of a cognitive or developmental disability.

¶ 54    While Colone was "obviously" outgoing and intelligent, the court saw no evidence that defendant was pressured by Colone; rather, they were peers who acted together. The court noted that the study contained in the mitigation packet discussed how adolescents commit acts together that they would not perform apart, and opined that was what happened in this case. Here, two peers worked together for a "certain end." The court reiterated that it recognized the childhood trauma caused by Davis's shooting, but that there was "nothing else"; to the contrary, defendant had a supportive family and friends.

¶ 55    The court found it "difficult" to determine, based on a "limited amount of evidence," whether defendant could be rehabilitated. Defendant's prior offenses, which were not "minor," began in 2014 and were addressed through the juvenile justice system. However, the juvenile system had not "done anything" because defendant was now before the trial court. The court

therefore made a "general statement" that hopefully defendant would have "rehabilitation *** because [he] will mature."

¶ 56    Considering the circumstances of this case, the court found that two people were murdered "for no good reason." Additionally, this was a "planned murder." The court noted that Fisher overheard defendant and Colone planning the murders, that Hutchens testified that Colone gave her defendant's and Colone's phones before the shooting, and that the Facebook messages showed the "formulation" of a plan to murder Turner and Flowers. Based upon the circumstances of the offenses and defendant's actions following the shooting, the court concluded that this was "not a situation where somebody driving down the street maybe saw somebody [he] didn't like, words were exchanged, and bullets started flying." Rather, this was a "much more serious planned event."

¶ 57    The court had not seen any evidence that defendant was unable to participate in his defense. Moreover, defendant had a significant juvenile history. The court therefore sentenced defendant to two consecutive 25-year prison terms.

¶ 58    Based upon our review of the trial court's detailed consideration of the juvenile sentencing factors under section 5-4.5-105(a), we conclude that the court did not abuse its discretion in imposing consecutive 25-year sentences. The trial court discussed each factor and its reasoning based on the facts and evidence presented. The court considered defendant's history as well as the circumstances of the offenses and defendant's role in planning the offenses to determine the appropriate sentence. While defendant disagrees with the weight the court gave to each mitigation factor, this court may not reverse the sentencing court just because we might have weighed the factors differently. See *McWilliams*, 2015 IL App (1st) 130913, ¶ 28.

¶ 59    Moreover, pursuant to recent legislation, defendant will be afforded a parole hearing after serving 20 years of his sentence. "A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences ***." 730 ILCS 5/5-4.5-115 (West 2020). Thus, defendant is not subject to a *de facto* life sentence. See *People v. Dorsey*, 2021 IL 123010, ¶ 54 (courts look to the earliest opportunity for release to assess whether a *de facto* life sentence was imposed); *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 54 ("the legislature *** created the new parole statute and modified the parole review factors for the purpose of creating a meaningful opportunity for parole for juvenile offenders"); *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56 (defendant did not receive "a *de facto* life sentence since he is eligible for parole").

¶ 60    Based on the foregoing reasons, we affirm defendant's convictions and sentences.

¶ 61    Affirmed.